**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 17-4005

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LARRY MILAN RECIO,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. George Jarrod Hazel, District Judge. (8:15-cr-00448-GJH-1)

Argued: January 24, 2018                                Decided: March 7, 2018

Before WILKINSON, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Wilkinson and Judge Niemeyer joined.

**ARGUED:** Lesley Whitcomb Fierst, CAPITAL ONE, Tysons Corner, Virginia, for Appellant. Francesca Anne Liquori, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, Sapna Mirchandani, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Stephen M. Schenning, Acting United States Attorney, Baltimore, Maryland, David I. Salem, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

A jury found Larry Recio guilty of being a felon in possession of a firearm. At trial, over his objection, the district court admitted into evidence a post assertedly to Recio's Facebook account that quoted a rap lyric. Recio appeals. He contends that the district court abused its discretion in admitting the Facebook post, and erred in declining to grant a mistrial but instead issuing an *Allen* charge when the jury initially indicated it was deadlocked. For the reasons that follow, we affirm.

I.

On May 15, 2015, two police officers, Shane Pumphrey and Christopher Rothenberger, were on patrol in Prince George's County, Maryland. They spotted Recio, whom they knew had outstanding warrants, and observed a gun protruding from his waistband. As Recio fled, the officers gave chase, one by car, the other on foot. Officer Pumphrey saw Recio jump over the hood of an abandoned car and toss away the gun. The officers could not catch up to Recio, so they returned to the spot where Officer Pumphrey had seen Recio throw away the gun. There, the officers recovered a loaded black handgun. Police officers arrested Recio the following month, in June 2015.

The Government indicted Recio on August 17, 2015. Before trial, the Government filed a motion in limine seeking admission of a post to a Facebook account that the Government alleged belonged to Recio. The post, from January 28, 2016 (about eight months after the charged incident), stated:

It's Always Tucked, Kuz I'll B Damn If My Life Get Took!!

2

The post, which contained no quotation marks or attribution to another author, closely mirrors lyrics to a rap song, *Get it in Blood* by Bloody Jay. In relevant part, the rap song's lyrics are: "it's always tucked, cause I'll be damned if I get my life took." The Government sought to introduce this post under Federal Rule of Evidence 801(d)(2), which provides that certain statements attributable to an opposing party are not hearsay.

At a pre-trial hearing, the district court heard argument as to the admissibility of the Facebook post, including whether the post was authentic and whether it might be character evidence of "other acts" prohibited by Rule 404(b). The following day, the district court granted the Government's motion, holding that the Facebook post was admissible under Rules 801(d)(2)(A) (direct admissions) and (B) (adoptive admissions), and that the Government had sufficiently authenticated it. The court admitted the Facebook post toward the conclusion of the trial.

At the close of the trial, the court submitted the case to the jury. While deliberating, the jury sent a series of notes. The first note asked whether the Government had to prove possession of the *particular* gun charged in the indictment, to which the court responded in the affirmative. The second note asked to re-listen to recordings of the officers' radio communications from the day of the incident, which the court permitted. The third note questioned whether these radio recordings had been edited to "exclude[] lapses," to which the court responded as the parties agreed. Around 4:30 pm, after deliberating for half a day, the jury sent a fourth note, stating:

> While we recognize that we have until 5 p.m. we do not believe any further
> deliberations will get us closer to a verdict today or in the future. . . . we are
> deadlocked. We are each of the individual conviction, through our in depth

3

and thorough review that our current viewpoints will be unchanged even after continued voluntary or involuntary deliberations. We have given every effort and regret that we are unable to come to a unanimous verdict.

Recio moved for a mistrial, which the district court denied. The court reasoned that though it had been "a short trial," this was only the jury's "first indication" of a deadlock after deliberating for just "a few hours." The court called in the jurors and provided them with a modified *Allen* charge[1] over Recio's objection, instructing them to "get some rest, get your mind off it, come back fresh tomorrow morning and continue your deliberations."

After deliberating for an hour the next morning, the jurors sent a fifth note, asking to see the gun, bullets, and magazine, which the court provided to them. In the late afternoon, the jury sent a final note, informing the court it had reached a unanimous verdict. The jury found Recio guilty.

Recio noted this timely appeal, challenging the district court's admission of the Facebook post, and its refusal to grant a mistrial, but instead to issue an *Allen* charge.

II.

We begin by addressing Recio's challenge to the admission of the rap lyric posted on Facebook. We review a district court's evidentiary rulings for abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997). Even if the court erred in

---

[1] An "*Allen* charge is a supplemental instruction given by a trial court," pursuant to *Allen v. United States*, 164 U.S. 492 (1896), "when the jury has reached an impasse in its deliberations and is unable to reach a consensus." *United States v. Cornell*, 780 F.3d 616, 625 (4th Cir. 2015).

admitting the evidence, we reverse only if that error was not harmless. *See* Fed. R. Crim. P. 52(a); *United States v. Briley*, 770 F.3d 267, 276 (4th Cir. 2014). Recio challenges the admission of the Facebook post on several grounds. We consider each in turn.

## A.

Recio first contends that the Facebook post was not his statement but inadmissible hearsay. The Federal Rules do not permit admission of a hearsay statement — an out-of-court statement offered to prove the truth of the matter asserted — unless a specific exception applies. Fed. R. Evid. 801, 802. But the Rules define certain statements as "not hearsay," including a statement "offered against an opposing party" that was "made by the party" (an admission) or a statement that "the party manifested that it adopted" (an adoptive admission). Fed. R. Evid. 801(d)(2)(A), (B). The Government maintains that consistent with this Rule, the Facebook post was not hearsay.

To constitute an adoptive admission, the Government must be able to point to "sufficient foundational facts from which the jury *could* infer that the defendant . . . acquiesced in the statement." *United States v. Robinson*, 275 F.3d 371, 383 (4th Cir. 2001) (emphasis added) (quoting *United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996)). Foundational facts were present here. Namely, Recio did not use quotation marks, attribute the lyric to the artist, or provide other signals to indicate to his Facebook audience that someone else authored the words in his post. Nor did he include additional explanation, commentary, or criticism that could refute an inference that he adopted the lyric as his own words. In addition, Recio slightly editorialized the song lyric. His post stated, "Kuz I'll B Damn If My Life Get Took!!"; the original lyric is "cause I'll be

5

damned if I get my life took."  Based on these facts, a jury *could* infer that by posting the lyric on Facebook, Recio meant to adopt it as his own words.

Recio suggests that those who repeat others' lyrics rarely manifest an adoption of the views expressed in those lyrics, because lyrics are "a different person's words" and often contain "puffery or braggadocio."  Appellant Reply Br. at 5–6.  To be sure, people may quote lyrics to provide criticism or commentary, to relay the lyrics to others, or simply because they like the song.  But in some instances, people quote lyrics because they wish to express a certain view and believe that the words of an artist — including a rap musician — express that view especially effectively.  Whether someone has adopted lyrics as his own statement thus depends on the particular facts of each case.  And as explained above, the facts here were sufficient for a jury to infer that Recio adopted the rap lyric as his own statement.[2]

## B.

Recio also maintains that the Facebook post was inadmissible because it was not relevant.  *See* Fed. R. Evid. 402.

To be relevant, evidence must have "any tendency to make a fact more or less probable," and that fact must be "of consequence in determining the action."  Fed. R.

---

[2] Recio argues that this conclusion is "absurd[]," offering the example of a person who sings along to a Bob Marley song and then has the lyric "I shot the sheriff" introduced against him at trial.  But that example only reinforces the fact-specific nature of this inquiry, for although one person might sing along to Bob Marley and no more, another might use the same lyric to brag about *actually* having shot a sheriff.  *See Smith v. Quarterman*, 471 F.3d 565, 567, 571–72 (5th Cir. 2006) (defendant convicted of murdering a deputy sheriff sang "I shot the sheriff, but in my case it was the deputy" while in jail).

Evid. 401. The "threshold for determining whether evidence is relevant is comparatively low," and "we rarely reverse such decisions because they 'are fundamentally a matter of trial management.'" *United States v. Kiza*, 855 F.3d 596, 604 (4th Cir. 2017) (quoting *United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014)).

Lyrics posted or authored by a defendant can be relevant if they match details of the alleged crime. That is so because the fact that a defendant posted lyrics about engaging in certain conduct makes it more probable that the defendant in fact engaged in that conduct. *See, e.g.*, *United States v. Belfast*, 611 F.3d 783, 820 (11th Cir. 2010) (rap lyrics referring to Liberian paramilitary group were relevant to show the defendant's "association with and continued identification as a member" of that group); *Holmes v. State*, 306 P.3d 415, 418–20 (Nev. 2013) (rap lyrics describing "jacking" a necklace in a parking lot while wearing a ski mask were relevant to show that the defendant stole a necklace in a parking lot while wearing a ski mask).

Lyrics can also be relevant to show a defendant's knowledge or motive. For example, the Eighth Circuit has held that a defendant's rap recordings about dealing cocaine were relevant to his knowledge and motive, because they "tended to show that he knew cocaine prices, used drug code words, and sold drugs to supplement his income." *United States v. Moore*, 639 F.3d 443, 448 (8th Cir. 2011); *see also United States v. Foster*, 939 F.2d 445, 456 (7th Cir. 1991) (rap lyrics were relevant to show defendant's "knowledge of narcotics trafficking, and in particular drug code words").

The rap lyric in this case was relevant to both Recio's alleged conduct (carrying a gun) and his motive for doing so (to protect himself). The phrase "It's Always Tucked"

suggested that Recio had always carried a gun tucked into his waistband, which made it more probable that he did so on May 15, 2015.  And the phrase "Kuz I'll B Damn If My Life Get Took" was relevant because it indicated that Recio had carried a gun for self-protection, which made the fact that he "always" carried a gun more probable.  Although reasonable minds could also interpret the lyric otherwise, that only affects the weight of the evidence, not its admissibility.

We therefore conclude that the Facebook post was relevant.

C.

Recio argues that even if relevant, the district court erred in admitting the Facebook post because its probative value was substantially outweighed by a danger of unfair prejudice.  *See* Fed. R. Evid. 403.

To be sure, lyrics, like other forms of artistic expression, can describe a panoply of violent, criminal, or distasteful conduct, and so in some cases courts have excluded lyrics, finding they primarily served to paint the defendant in an unflattering light.  For example, the Eleventh Circuit has held that a rap video that "contained violence, profanity, sex, promiscuity, and misogyny" was "heavily prejudicial" and had "minimal" probative value to the alleged drug and money laundering crimes.  *United States v. Gamory*, 635 F.3d 480, 488, 493 (11th Cir. 2011); *see also Hannah v. State*, 23 A.3d 192, 202 (Md. 2011) (holding that rap lyrics were more prejudicial than probative because they "had no tendency to prove any issue other than . . . [that the defendant] was a violent thug").

This is not such a case.  The Government introduced a rap lyric consisting of a single sentence that described only the type of conduct of which Recio is accused —

8

carrying a gun — and a reason for doing so — self-protection.[3]  Unlike *Gamory*, the lyric

referred to no other, irrelevant behavior, like threatening the police or degrading women,

that would have unfairly caused the jury to see Recio as a culpable person.  Accordingly,

the risk of unfair prejudice did not substantially outweigh the probative value of the

Facebook post.

D.

Recio additionally argues that the Government failed to authenticate the Facebook

post because it offered insufficient evidence that the post in question was authored by

Recio.

A proponent of evidence must "produce evidence sufficient to support a finding

that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  However, "the

burden to authenticate under Rule 901 is not high."  *United States v. Hassan*, 742 F.3d

104, 133 (4th Cir. 2014) (internal quotation marks and citation omitted).  The district

court must merely conclude that "the jury *could* reasonably find that the evidence is

authentic," not that the jury necessarily *would* so find.  *See id.* (internal quotation marks

and citation omitted) (emphasis added).

In *Hassan*, the Government (1) "presented the certifications of records custodians

of Facebook," and (2) "track[ed] the Facebook pages and Facebook accounts to [the

---

[3] Although the jury did hear the lyrics to other portions of the song read aloud, it was Recio, not the Government, who introduced these additional lyrics into evidence. Recio thus cannot contend that the rest of the song improperly swayed the jury.  *See Shields v. United States*, 273 U.S. 583, 586 (1927) ("A defendant . . . cannot complain of error which he himself has invited.") (internal quotation marks and citation omitted); *United States v. Herrera*, 23 F.3d 74, 75 (4th Cir. 1994) (same).

defendants'] mailing and email addresses via internet protocol addresses." *Id.* Given that evidence, we held that the district court did not abuse its discretion in admitting the Facebook posts as authentic. *Id.* at 133–34.

Here, the Government presented a certification by a Facebook records custodian, showing that the Facebook record containing the post was made "at or near the time the information was transmitted by the Facebook user." And the Government sufficiently tied that "Facebook user" to Recio by showing that: (1) the user name associated with the account was "Larry Recio," (2) one of the four email addresses associated with the account was "larryrecio20@yahoo.com," (3) more than one hundred photos of Recio were posted to the account, and (4) one of the photos posted to the user's timeline was accompanied by the text "Happy Birthday Larry Recio."

Recio suggests that even if it was his Facebook account, someone else may have accessed it. But there was no evidence that another person accessed the Facebook account. Moreover, what matters is not whether a jury could find that Recio did *not* author the post in question, but rather whether the jury could reasonably find that he *did*. Given the strong evidence that the Facebook account was Recio's, and without any evidence of unauthorized access, the jury could find that Recio was the true author of the post. The Government therefore properly authenticated the Facebook post.

E.

Recio's final attack on the admission of the Facebook post is that it constituted inadmissible character evidence under Federal Rule of Evidence 404(b). Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's

10

character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The Government argues that the district court introduced the Facebook post here "as an admission of the charged crime, *not* as 404(b) evidence" of *other* acts taken by Recio. Appellee Br. at 16.

Because the Facebook post stated, "It's *Always* Tucked," the jury did not have to draw an improper inference about Recio's character from what he did on other occasions. Rather, the jury could interpret the Facebook post to mean that Recio admitted to carrying a gun on many occasions *including* the one charged. *See Ware v. State*, 759 A.2d 764, 675–76 (Md. 2000) (holding that testimony that the defendant "always carried a gun" was "relevant to establish that [the defendant] possessed a gun" during the events in question). Therefore, the Facebook post was not evidence of "other acts" from which the jury had to infer Recio's character; it was evidence of the charged crime itself. *See Tann v. United States*, 127 A.3d 400, 468–69 (D.C. 2015) (explaining that rap lyrics that are "autobiographical" in nature do not carry an "undue risk of the statements being misunderstood or misused as criminal propensity or bad act evidence" (internal quotation marks and citation omitted)); *Holmes*, 306 P.3d 415, 420 (holding that a "single stanza" from a rap song that "relayed facts quite similar to the crime charged" was not impermissible "evidence of bad character or criminal propensity").

Recio claims that because his Facebook post used the present tense, "*It's* Always Tucked," it was unreliable evidence of past conduct. Contrary to Recio's argument, however, people commonly use the word "always" to encompass past behavior. Consider one who states, "I always walk to work." It would be very odd to make that

11

declaration despite never having walked to work in the past. The more natural reading is that this person established a pattern of walking to work in the past, and that pattern continues today. Thus, a jury could reasonably interpret Recio's Facebook post stating "It's Always Tucked" as evidence of his past conduct.

Recio also contends that because he was recovering from a shooting during some of the time between the charged incident and the Facebook post, he could not have literally "always" carried a gun. But even if the word "always" was an exaggeration, a jury could interpret Recio's Facebook post as describing a pattern of *regularly* (though not invariably) carrying a gun, including on the date of the incident. That the post may have exaggerated may diminish its weight, but does not transform it into character evidence.

We therefore conclude that the Facebook post was direct evidence of the crime charged, not impermissible evidence of other acts prohibited by Rule 404(b).

F.

We further hold that even if the court erred in admitting the Facebook post, any error was harmless. The harmless error inquiry asks not whether "the government adduced sufficient evidence to support Defendant's conviction," but whether the error "may have swayed the jury's judgment." *United States v. Hall*, 858 F.3d 254, 279–80 (4th Cir. 2017). The overall strength of the government's evidence constitutes an important factor in this inquiry. *See id.*

Here, the Government's case rested primarily on the testimony of the two police officers on the scene. Both officers testified that they observed Recio with a handgun

12

tucked in his waistband.  Officer Pumphrey also recounted that he saw Recio "toss[] the gun with his right hand."  Contemporaneous recordings of radio communications between the two officers corroborated this testimony.  The officers also recovered a handgun at the location where, according to them, Recio had tossed the handgun.

The jury's notes to the district court suggest that the jurors too were focused on the officers' testimony and physical evidence, not on the Facebook post.  The jury asked to listen to the radio recordings, asked whether the recordings omitted any gaps, and asked to see the gun, bullets, and magazine.  The jury did not ask similar questions about the Facebook post or the rap song.

Recio's primary response is that the jury revealed its confusion as to the Facebook post in its first note asking "whether it needed to merely find that the defendant had been in possession of *any* weapon."  Appellant Br. at 36.  But that was likely a basic question about what the Government had to prove — for example, the jury may have wondered if it mattered whether the gun introduced at trial was in fact the same gun the officers claimed to have seen Recio carry.  Given that the jurors evidently felt comfortable asking several questions about particular pieces of evidence, it seems probable that if they had been confused by the Facebook post, they would have simply asked about it directly.  Moreover, the court responded to this inquiry that the Government had to "prove that the defendant possessed the particular weapon charged in the indictment," eliminating any potential confusion as to that issue.

Accordingly, even if the district court erred in admitting the Facebook post, the error was harmless.

13

III.

We also reject Recio's contention that the district court erred in refusing to grant a mistrial and instead instructing the jury to continue its deliberations. We review a district court's denial of a motion for a mistral for abuse of discretion. *United States v. Wallace*, 515 F.3d 327, 330 (4th Cir. 2008). We similarly "review a district court's decision to give an *Allen* charge and its content for abuse of discretion." *United States v. Hylton*, 349 F.3d 781, 788 (4th Cir. 2003).

A.

The "denial of a defendant's motion for a mistrial is within the sound discretion of the district court and will be disturbed only under the most extraordinary of circumstances." *United States v. Dorlouis*, 107 F.3d 248, 257 (4th Cir. 1997). Recio cannot show such extraordinary circumstances here.

In asking for a mistrial, Recio rested on the jury's note indicating it was deadlocked after deliberating for half a day. To hold that a district court abuses its discretion in declining to declare a mistrial under those circumstances would effectively require a district court invariably to declare a mistrial the first time a jury indicates it cannot reach a verdict. Such a rule would eliminate the "sound discretion" a district court must have if it is to manage trials.

B.

Turning to the district court's *Allen* instruction to the jury, we similarly discern no abuse of discretion. The "principal concern that we have had with *Allen* charges is to ensure that they apply pressure to the jury in a way that preserves *all* jurors' independent

14

judgments and that they do so in a balanced manner," rather than unduly pressuring the jurors in the minority. *Hylton*, 349 F.3d at 788 (emphasis added). An *Allen* charge is therefore proper if the instructions "do not coerce the jurors to abandon their view." *United States v. Cornell*, 780 F.3d 616, 626 (4th Cir. 2015).

This standard is easily met here. The district court instructed the jury that because "it has only, at this point, been a few hours," the jury should "break for the evening, go home, get a good night's sleep, get some rest, get your mind off of it, come back fresh tomorrow morning, and continue your deliberations." It is hard to conceive of how such an innocuous and friendly instruction could make any juror feel coerced.

We therefore hold that the district court did not abuse its discretion in instructing the jury to continue deliberating.

IV.

For the reasons stated, the judgment of the district court is

*AFFIRMED.*

15