NOT RECOMMENDED FOR PUBLICATION
File Name:  19a0070n.06

**No. 18-1231**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Feb 12, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON  APPEAL  FROM  THE UNITED  STATES  DISTRICT COURT  FOR  THE  WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| MIKE MORENO QUINTANA, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:  SUTTON, GRIFFIN, and LARSEN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Mike Quintana facilitated the sale of two pounds of methamphetamine between a co-defendant and an informant in Kalamazoo, Michigan, and a jury convicted him of conspiracy to distribute or possess with intent to distribute methamphetamine and distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846.  He raises two discrete evidentiary challenges to his convictions.[1]  We affirm.

I.

The first issue arises from the district court's decision to restrict the testimony of a prisoner who overheard jailhouse conversations between the co-defendant and Quintana's cellmate.

---

[1]To the extent defendant raises cumulative error as an issue on appeal in his brief, he has forfeited our consideration of it because he did not identify cumulative error in his statement of issues.  *See United States v. Calvetti*, 836 F.3d 654, 664 (6th Cir. 2016).

Following lengthy testimony by George Humrich (the co-defendant) and Audie Aker (the informant), the government offered brief testimony of Clint Smith, defendant's cellmate. For our purposes, Smith testified that Quintana explained how he generally obtained methamphetamine from Mexico and that Quintana called Humrich a "rat" for testifying against Quintana. Quintana did not, however, tell Smith anything specific about the Kalamazoo drug deal. As for Humrich, Smith testified he did not know him, that the two shared a bus ride together while leaving court and stayed in the same cell in the U.S. Marshall lockup, and that the two did not talk about Humrich's case.

Quintana's attorney then attempted to offer the testimony of an inmate who overheard Smith and Humrich talking the day before they testified at Quintana's trial. Among other things, Quintana's attorney proffered the inmate, Kyle Mosley, would testify that Smith and Humrich talked about "Humrich's case at some length," that Smith got into a "scuffle" with Quintana, and that "Humrich thanked" Smith for "beating on Mr. Quintana." He offered the evidence not for the truth of the matter asserted, but to attack Smith and Humrich's credibility. The district court disagreed, finding the substance of Mosley's testimony inadmissible hearsay. However, it permitted Mosely to testify that he overheard Smith and Humrich talking; as such, Mosley testified that he was in the same holding tank as Humrich and Smith on the morning before, and overheard Humrich and Smith "convers[ing] with one another" "during the course of the entire morning." Defendant contends the district court's exclusion of the substance of Mosley's testimony under the Hearsay Rule constitutes reversible error. We need not decide whether the district court's exclusion here was in error because even if it was, it was harmless.

"A non-constitutional evidentiary error is harmless if the government can show by a preponderance of the evidence that the error did not materially affect the verdict." *United States*

*v. Luck*, 852 F.3d 615, 628 (6th Cir. 2017) (internal quotation marks omitted). Where "the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the judgment must be reversed. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995); *see also Jaradat v. Williams*, 591 F.3d 863, 869 (6th Cir. 2010). In reviewing for harmlessness, we "must take account of what the error meant to the jury, not singled out and standing alone, but in relation to all else that happened." *United States v. Hardy*, 228 F.3d 745, 751 (6th Cir. 2000) (internal quotation marks and brackets omitted). In our view, the district court's exclusion of Mosley's proffered collateral testimony had no material effect on the jury's verdict.

*What it was not going to do*. There is no record evidence indicating Mosley was going to provide any testimony that would undermine Aker's testimony—which unequivocally linked Quintana to dealing methamphetamine generally, and to driving the transaction between Humrich and Aker specifically—or Humrich's similar testimony. Nor are we convinced the purported testimony would establish Humrich and Smith "conspired" to coordinate their testimony. That they talked "extensively" about Humrich's case offers nothing specific on a conspiracy to offer perjured testimony, especially because the substance of their testimony did not overlap.

*What it was going to do*. Mosley was going to offer little regarding Humrich. At most, the testimony could establish Humrich did not like Quintana given Mosley's purported knowledge of a statement that Humrich "thanked" Smith for "beating on Mr. Quintana." Yet the jury already had Humrich's own statements about his dislike for Quintana in light of Quintana changing the financial terms of the transaction (requiring Humrich to provide more money than agreed upon to purchase the methamphetamine from Quintana before his subsequent resale to Aker). Indeed, the jury also had significant reason to question Humrich's version of the events—it heard audio between Humrich and Aker before and during the transaction that seemed to imply Humrich

purchased the methamphetamine not from Quintana, but from someone else, and that Quintana wasn't making any money off this transaction. Any testimony further implicating Humrich's distaste for Quintana adds nothing to whether a juror would find Humrich credible.

Mosley's testimony was going to be somewhat harmful to Smith's testimony. Most damning for Smith is that it contradicted Smith's testimony that he did not talk about Humrich's case. In our view, however, this matters not. Smith offered nothing of substance on the underlying drug crimes, and only offered cumulative testimony about Quintana's activity after he was in custody. The remaining aspects of Smith's testimony—that Quintana told Smith about how he obtained methamphetamine from Mexico and called Humrich a "rat" for testifying against him— are insubstantial. The government produced phone calls between Quintana and Aker with Quintana bragging about having the ability to obtain methamphetamine (in Quintana's phrasing, the "connect"); Smith's testimony was therefore cumulative at best on this point. The "rat" comment says nothing about Humrich (or his credibility), and besides, the jury was already presented with evidence reflecting Quintana being upset at Humrich for testifying against Quintana—they reviewed a jailhouse letter from Quintana to Humrich threatening Humrich and his family for "talking in [Quintana's] case."

For these reasons, the district court's substantive exclusion of Mosley's collateral testimony, if error, was harmless.

## II.

The second issue on appeal relates to the district court's authentication of certain Facebook records. At trial, the government produced recorded phone calls and text messages between Aker and Quintana about arranging a drug deal in July 2016, but that deal never came to fruition and the two stopped communicating. Aker testified that the two reconnected in October 2016 by way

of a Facebook message from Quintana. That reunion eventually connected Humrich to Aker, which culminated in their deal for two pounds of methamphetamine.

By themselves, the Facebook records offer little. They show Quintana sent messages—the content of which is not captured—to Aker in late October, 2018, Quintana attempted to call Aker on November 3, 2016 (two days after the drug deal), and Quintana "removed" Aker as a friend on November 4, 2016 (three days after the drug deal). The government moved to admit the Facebook evidence as self-authenticating business records. *See* Fed. R. Evid. 803(6), 902(11). It did so by relying upon a certificate of authenticity submitted by Facebook. The district court authenticated most of the records by coupling Facebook's certificate of authenticity with their content. More specifically, it found information on what was marked as Government Exhibit 17a to "confirm that at least some of these records are Facebook records belong to Mr. Quintana's account." That information reveals the following about the account: it was titled to "Mikie Quintana"; it used "theoneu.hateon" as a "vanity name"; the registered email addresses were "theoneuhateon@gmail.com" and "mikequintana612@gmail.com"; it belonged to an individual in Glendale, Arizona (Quintana's hometown); it listed a Phoenix-area telephone number (but not one previously associated with Quintana); and it was registered on September 13, 2016. In addition, Aker produced and testified about a screenshot of the account—as accessed through Aker's Facebook account—reflecting a picture of Quintana and identified the moniker "Throne U Hateon" as one used by Quintana.

Quintana contends the district court abused its discretion in finding the government properly authenticated the Facebook records as those belonging to him. The gist of his argument is that the identifying information contained on Exhibit 17a—his name, two emails (one of which was his name, and the other his moniker), and a telephone number—did not contain sufficient

"distinctive characteristics" under Fed. R. Evid. 901(b)(4) to authenticate the records given that the government offered no evidence linking him to the email addresses and phone number.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Evidence is authentic when the proponent offers "sufficient proof . . . that a reasonable juror could find in favor of authenticity." *United States v. Jones*, 107 F.3d 1147, 1150 n.1 (6th Cir. 1997) (citation omitted). Authentication is a "relatively low[] hurdle," *United States v. Farrad*, 895 F.3d 859, 878 (6th Cir. 2018), and may be proved through a variety of methods, including circumstantial evidence, *United States v. Crosgrove*, 637 F.3d 646, 658 (6th Cir. 2011). We review a district court's authentication determination for abuse of discretion, *Jones*, 107 F.3d at 1149, and we discern no abuse of discretion in admitting the Facebook records.

In large part, we've seen this case before. In *Farrad*, we rejected a similar authenticity challenge to photographs taken from Facebook. The photographs there formed the substantive proof of criminal conduct (possessing a firearm as a felon), and the district court admitted them as self-authenticating business records. 895 F.3d at 865–66. Although we held the district court erred in admitting the photographs as business records, we concluded "regular authentication under Rule 901" permitted their admissibility. *Id.* at 877. Holding the government sufficiently linked the photographs to the defendant to meet its authenticity showing, we noted in *Farrad* two significant details relevant for our purposes here. First, the account details significantly overlapped with the defendant. Those details included that "each photo had come from a Facebook account identified as 'Malik.Farrad.5,' registered to a 'Malik Farrad' with the email address 'AllaFarrad@gmail.com,' and associated with Knoxville, Tennessee [(Farrad's location)]." *Id.* at

867. Second, the photos "appeared to show Farrad, his tattoos, and (perhaps most probatively) distinctive features of Farrad's apartment." *Id.* at 878; *see also United States v. Thomas*, 701 F. App'x 414, 419–20 (6th Cir. 2017) (holding a district court did not abuse its discretion in finding pictures taken from Facebook as authentic due to similarities between the pictures and the defendant).

We see no reason to deviate from *Farrad*'s approach here. Rule 901's authentication principles apply to general requests to authenticate an individual's social media profile just as they do to requests to authenticate pictures obtained from an individual's social media profile. 895 F.3d at 877. And the facts presented in *Farrad* line up with those presented here. We have an account in defendant's name, an email address with his name and moniker, a location linked to defendant, dates that correspond to witness testimony, and a picture of defendant. *See also United States v. Recio*, 884 F.3d 230, 237 (4th Cir. 2018); *United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016). We also have powerful circumstantial evidence linking defendant to the account—changes to the account a few days after Aker's arrest, including the deletion of Aker as a friend. Thus, we have more "than the page itself" to support authentication. *United States v. Vayner*, 769 F.3d 125, 132 (2d Cir. 2014).

To be sure, the government could have done more to connect the Facebook profile to Quintana, like "track[] the Facebook pages and Facebook accounts to [his] mailing and email addresses via internet protocol addresses," *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014), or provide evidence linking the email addresses and telephone number on the account with Quintana. *See Lewisbey*, 843 F.3d at 658; *see also United States v. Browne*, 834 F.3d 403, 411–16 (3d Cir. 2016); *United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015). But given the highly deferential nature of abuse-of-discretion review, we find no reversible error. A district court need

only deem the offered proof of authentication sufficient "so that a reasonable juror could find in favor of authenticity. . . . The rest is up to the jury." *Jones*, 107 F.3d at 1150 n.1 (citation omitted); *see also Recio*, 884 F.3d at 237 ("Moreover, what matters is not whether a jury could find that Recio did *not* author the post in question, but rather whether the jury could reasonably find that he *did*."). The district court did just that, and nothing prevented Quintana from arguing the profile's "genuineness before the jury."[2] *Jones*, 107 F.3d at 1150 n.1.

Alternatively, we conclude that even if the district court erred in authenticating the Facebook records, it was harmless. Quintana argues the jury had every reason to disbelieve Humrich and that "there were specific reasons to believe that he, not Quintana, was behind the transaction with Aker." The implication is that Humrich (or someone else) created the Facebook profile, pretended to be Quintana, and arranged the deal to set up Quintana. Without the Facebook page presented to the jury, the argument goes, there's nothing linking Quintana to the consummated deal. The problem with this fanciful speculation is twofold. First, the jury heard testimony from Aker that he communicated with Quintana *over the phone* after the two reestablished contact via Facebook. And second, the jury would have needed evidence linking Humrich and Aker without Quintana. Yet they heard the opposite—both testified they did not know each other until the deal.

### III.

For these reasons, we affirm the district court's judgment.

---

[2]Given this, we need not address the government's alternative position that the business record exception applies—notwithstanding *Farrad*—because it sought to admit the Facebook records to reflect that communications between Quintana and Aker occurred on specific dates and times, and not for the actual content of the communications themselves.