**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-4670**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOHNATHAN C. MCCASLAN,

Defendant - Appellant.

_____

Appeal from the United States District Court for the District of South Carolina, at Spartanburg.  Donald C. Coggins, Jr., District Judge.  (8:23-cr-00749-DCC-1)

_____

Submitted:  December 5, 2025                                Decided:  June 8, 2026

_____

Before BENJAMIN and BERNER, Circuit Judges, and John A. GIBNEY, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**ON BRIEF:**  Christopher W. Adams, ADAMS & BISCHOFF, LLC, Charleston, South Carolina; Matthew K. Winchester, LAW OFFICES OF MATTHEW K. WINCHESTER, Atlanta, Georgia, for Appellant.  Brook B. Andrews, Acting United States Attorney, William J. Watkins, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In the quiet town of Calhoun Falls, South Carolina, a failing marriage between Defendant Jonathan McCaslan and his wife Kimberly soon became the center of a strange and troubling series of events. Allegedly seeking an upper hand in the divorce proceedings, McCaslan began directing police attention toward Kimberly. McCaslan started with repeated calls to local police, reporting incidents involving Kimberly. Over time, however, the situation escalated beyond ordinary complaints. According to the Government, the chain of events ultimately culminated in McCaslan mailing threatening letters containing a white powdery substance that were written and addressed to suggest that Kimberly was the sender. The white powdery substance was later revealed to be benign.

Based on these letters and DNA evidence derived from them, the Government charged McCaslan in a four-count indictment for cyberstalking, mailing of a threatening communication, and making a false chemical threat. A jury convicted McCaslan on all counts.

On appeal, McCaslan argues that the evidence was insufficient to sustain his conviction for the false chemical threat counts because the letters contained only a powdery substance and did not explicitly reference any chemical agent or weapons. He also argues that the district court erred in overruling his chain-of-custody and authentication objections regarding a letter, envelope, and stamp used to collect the DNA samples. Neither argument warrants reversal.

2

## I. Background

### A. Events in Calhoun Falls

Defendant Jonathan McCaslan and Kimberly were separated and going through a divorce during the events giving rise to the indictment. J.A. 229.[1] The Government alleges that McCaslan engaged in a series of actions intended to gain an advantage in the divorce proceedings, ultimately culminating in the mailing of anonymous, threatening letters designed to implicate Kimberly. *Id.*

### 1. Events Leading Up to the Letters

One fall evening, Kimberly drove to the Savannah Grill to get dinner. J.A. 257. The Savannah Grill was one of only two places to eat in town, the other being a 7-Eleven. *Id.* As one witness described it, this was "small town South Cackalacky." *Id.*

When Kimberly arrived, Officer Jordan Smith was already in the parking lot. Smith, the narcotics investigator and one of only three full-time officers at the Calhoun Falls Police Department, knew McCaslan from his time as a volunteer firefighter but knew Kimberly only by name. J.A. 256–57. Smith was there because McCaslan had tipped him off, telling him both when Kimberly would be at the restaurant and that she would be driving on a suspended license. J.A. 264–65.

Smith watched Kimberly enter the restaurant and order her food. *Id.* When she came back outside, Smith approached her and asked if she'd "gotten her license fixed."

---

[1] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the district court. Page numbers for citations to the J.A. utilize the "[J.A. or JA] #" numbering at the bottom of the page on each document.

J.A. 265. Kimberly initially advised him that she had, but after some light questioning, she fessed up and told him that she didn't have a valid license. J.A. 427–28. Rather than issuing her a ticket, Smith allowed her to call someone with a valid license to pick her up from the restaurant. *Id.*

For the moment, the encounter ended quietly. *Id.* Kimberly later testified that she believed "that there was nothing else to it." J.A. 426.

Approximately two weeks later, another strange development surfaced. Kimberly, a licensed nurse, was purportedly contacted by the state nursing board regarding a prior traffic stop in which she had been arrested for driving with a suspended license and possessing pain medication without a valid prescription. J.A. 367, 435. But the board's inquiry did not reach Kimberly directly. J.A. 368, 389. Instead, the email requesting a statement was sent to aparamedic01@hotmail.com, an account belonging to McCaslan. J.A. 368, 389. Although Kimberly had previously used her own email address to renew her license, the most recent renewal listed McCaslan's email instead. J.A. 370–71.

The nursing board requested a response by return email, but it received a mailed letter instead. J.A. 368, 373, 377. The letter appeared to come from Kimberly and read like a confession. J.A. 375-76. It contained statements admitting to stealing controlled substances, forging prescriptions, and working outside the state in violation of licensing regulations. *Id.* It also urged the board to review the guardian ad litem report from the divorce proceedings. *Id.*

Around the same time, another dispute arose involving the divorcing couple. McCaslan contacted another Calhoun Falls police officer, Officer Perry Hill, and reported

4

that Kimberly had sold a generator that belonged to them as marital property. J.A. 355. Kimberly had in fact sold the generator and asked her son to deliver it to the buyer. J.A. 434. When Hill questioned the son, Kimberly intervened, reminded Hill that her son was a minor, and asked that all questions be directed to her. J.A. 434–35. This encounter lasted about twenty minutes. J.A. 356.

During the following week, the officers considered whether criminal charges against Kimberly might be appropriate based on both the generator dispute and the earlier Savannah Grill incident. J.A. 268. Smith sought a warrant for the restaurant incident and Officer Treaco Hoover (who was following up for Hill) sought one for the generator incident. *Id.* Only one of those efforts succeeded. *Id.* Warrants were issued for the restaurant incident, but the magistrate judge decided that the generator dispute belonged in family court. *Id.* McCaslan learned of the magistrate judge's decision and was upset that only one set of warrants was issued. J.A. 593; J.A. 357; J.A. 269.

A week after learning about the magistrate judge's decision, McCaslan spoke with Smith, passing along bits of cryptic information. J.A. 263. McCaslan claimed Kimberly had been asking questions about Smith and his duties at the police department. *Id.* He also said he'd seen Kimberly and her son drive past Smith's home, recording the property. J.A. 263–64.

### 2. The Letters to Law Enforcement

A day later, something arrived in Smith's mailbox. Smith lived on Rice Street with his fiancée, Tamera Lee. J.A. 235–36. The envelope contained a typed letter and white powder. J.A. 258–59. Smith worried that the substance might be something dangerous,

5

possibly fentanyl or another harmful agent. *Id.* He instructed Lee to wash her hands with cold water and put on protective gloves. *Id.*

The message itself was threatening:

> YOU THINK YOU CAN PRESS CHARGES AGAINST ME. I'VE ALREADY BEAT YOU AT YOUR ON GAME. I GOT CONNECTION TO. YOU CAN NOT TOUCH ME. I KNOW HOW DIRTY YOU ARE. YOU AND THAT DOG YOU LIVE WITH CAN KISS MY ASS. IF I SEE HER WHEN I WORK WITH HER AGAIN I WILL BEAT HER ASS. YOU WILL GET WHATS COMING TO YOU. YOU CAN NOT HIDE BEHIND THAT BADGE.

J.A. 239; S.A. 2.

Given the circumstances, Smith and Lee suspected Kimberly. J.A. 266. Smith had active warrants connected to the earlier Savannah Grill incident, and Lee had previously worked with Kimberly at a local nursing home, where the two women had a workplace dispute. J.A. 260; J.A. 239–40. McCaslan knew about the active warrants and about Lee and Kimberly's workplace disagreement. J.A. 584–85. But Kimberly herself did not know about the active warrants issued for her. J.A. 425–26.

Soon afterward, a second letter surfaced. Postal workers intercepted it before it could reach the Calhoun Falls Police Department's post office box. S.A. 4. Like the first letter, it contained white powder and a typed message. *Id.*

> PERRY I KNOW HOW DIRTY YOU ARE. YOU TRIED TO GET ME LOCKED UP. YOU TIRED TO GET MY KID IN TROUBLE. YOU WILL PAY FOR WHAT YOU DONE. I THOUGHT WE WERE BETTER THAN THAT. I'VE DONE FAVORS FOR YOUR FELLOW OFFICERS AND GET TREATED LIKE THIS. I WILL START TALKING IF I GO TO JAIL. TELL YOUR ASSITANT CHIEF TO PAY ATTENTION.

J.A. 358–59; S.A. 5.

6

The letter appeared to be directed at Hill, the officer who had responded to McCaslan's complaint about the generator. J.A. 359. Hill, like Smith, suspected Kimberly might be responsible. *Id.*

## B. Investigation and Chain of Custody of Rice Street Evidence

The situation quickly drew the attention of investigators. Smith reported the Rice Street letter to his chief of police, who instructed him to contact the Abbeville County Sheriff's Office and Assistant Chief Treaco Hoover of the Calhoun Falls Police Department. J.A. 259. Hoover arrived at Rice Street and helped collect the evidence. *Id.* Initial field tests suggested the presence of fentanyl, raising concern that the substance might be dangerous. *Id.* The letter, the envelope (bearing outdated 41-cent stamps), and the remaining powder were placed into an evidence bag. J.A. 247; J.A. 261. Hoover sealed the bag and put it on his desk at the police department. J.A. 323–24.

That same day, the South Carolina Law Enforcement Division ("SLED"), took over the investigation. *Id.* SLED's bomb squad responded to the police department, located the sealed evidence bag on Hoover's desk, opened it, and tested the powder. J.A. 325–27. SLED determined that the powdery substance was harmless.[2] J.A. 326. SLED officers took the letter and envelope into custody and transported it to the SLED lab in Columbia. J.A. 393; J.A. 417.

---

[2] Later laboratory analysis indicated the substance in the letter had the presence of milk-based infant formula, water, and linseed oil.

While the bomb squad addressed the physical evidence, other SLED investigators interviewed witnesses. J.A. 420. Smith, Lee, and Hoover provided voluntary statements. *Id.* SLED investigators also reviewed the doorbell camera footage at Rice Street, which showed Smith and Lee opening the envelope containing the white powdery substance. *Id.*

Over the next several weeks, the SLED laboratory conducted forensic analysis on the evidence. J.A. 516; J.A. 546; J.A. 557. The scientists attempted to test the envelope flap, but that sample had been contaminated during the forensic analysis and could not be used. J.A. 522–23; J.A. 546. Although the envelope flap was compromised, SLED discovered McCaslan's DNA on the stamps. J.A. 552.

**C. Criminal Charges, Objections to Rice Street Evidence, and Post Trial Motions**

McCaslan was charged in a four-count second superseding indictment for (1) cyberstalking in violation of 18 U.S.C. § 2261A(2)(B); (2) mailing of a threatening communication in violation of 18 U.S.C. § 876(c); (3) conveying false and misleading information regarding the unlawful transfer of an agent, toxin, or chemical by mailing a letter containing a powdery substance to 318 Rice Street in violation of 18 U.S.C. § 1038(a)(1); and (4) conveying false and misleading information regarding the unlawful transfer of an agent toxin, or chemical by mailing a letter containing a powdery substance to P.O. Box 246 in violation of 18 U.S.C. § 1038(a)(1). J.A. 18–20. McCaslan pled not guilty and demanded a jury trial.

A significant focus of McCaslan's pretrial motions and objections was to exclude the Rice Street letter from evidence. J.A. 21; J.A. 28; J.A. 35. McCaslan moved in limine to introduce evidence that the Calhoun Falls Police Department made mistakes during the

8

early phase of the investigation and that a Calhoun Falls Police Department officer who should not have participated in the investigation did in fact participate in the investigation. J.A. 26–27; J.A. 31–33; J.A. 39. The district court ruled that McCaslan could cross-examine witnesses concerning the mishandling of evidence and any poor investigative techniques. J.A. 182–83.

The evidentiary dispute was complicated further when Hoover, the officer who had first collected and stored the evidence from Rice Street, died before trial and therefore could not testify about his role in the chain of custody. J.A. 150. At trial, McCaslan raised several chain-of-custody objections to the Rice Street letter. *See, e.g.*, J.A. 149–152; J.A. 200–03. McCaslan argued that, without Hoover, the Government could not link the evidence bag that Hoover left Rice Street with to the evidence bag used by SLED. J.A. 200. The district court overruled McCaslan's objections but allowed him wide latitude to cross-examine the witnesses on the authenticity of the evidence. J.A. 275.

The jury returned a guilty verdict on all four counts. J.A. 767. McCaslan then moved for judgment of acquittal pursuant to Federal Rules of Criminal Procedure 29. J.A. 57. In his motion, McCaslan argued, among other things, that there was insufficient evidence to support the conviction on counts three and four because neither letter indicated a chemical weapons violation was taking place or would take place. *Id.*

The district court denied McCaslan's motion. J.A. 79. The district court found that, although the content of the letters charged in counts three and four did not specifically reference the powder they contained, the powder's inclusion in the threatening letters was

9

sufficient to convey "the specific presence of a weapon, in the form of an agent, toxin, or chemical, in the letters." J.A. 88.

McCaslan now appeals. We have jurisdiction to review the appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II. Analysis

On appeal, McCaslan argues (A) he cannot be convicted, under counts three and four, for sending a hoax chemical threat letter in violation of 18 U.S.C. § 1038(a)(1) because the letters did not explicitly threaten chemical agents, and (B) the district court erred in overruling his chain of custody and authentication objections regarding the letter used to collect DNA samples. Both arguments fail.

### A. Sufficiency of Evidence

Because McCaslan moved for acquittal under Federal Rules of Criminal Procedure 29, we review his sufficiency of the evidence argument de novo. *United States v. Hicks*, 64 F.4th 546, 550 (4th Cir. 2023). We inquire whether "any rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt" when the evidence is viewed in light most favorable to the Government. *United States v. Robinson*, 855 F.3d 265, 268 (4th Cir. 2017).

McCaslan was charged under counts three and four for sending threatening letters containing a suspicious substance in violation of 18 U.S.C. § 1038(a)(1). The section reads as follows:

> Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this title.

18 U.S.C. § 1038(a)(1).

In other words, a conviction for conveying false and misleading information regarding the unlawful transfer of an agent, toxin, or chemical weapon requires (1) that the defendant knowingly engaged in conduct with the intent to convey false or misleading information; (2) that the defendant conveyed information under circumstances in which such information may reasonably have been believed; and (3) that the information indicated that a violation of biological weapons statutes, chemical weapons statute, or weapons of mass destruction statute was taking place or would take place. *See id.*

This section criminalizes fake threats (like hoax anthrax threats and hoax bomb threats) because, even when the threat is ultimately found to be harmless, it creates public panic and demands law enforcement and emergency response. *See* H.R. Rep. No. 107-306: Anti-Hoax Terrorism Act 2001 (November 29, 2001) ("[A] hoax is designed to instill fear into the public or its target . . . [and] are a serious threat to the public's safety on many levels."). The law ensures that individuals cannot knowingly incite fear or waste public resources by creating a false emergency. *See id.* ("First, such a hoax distracts law enforcement from the actual threats or actual emergencies and, in effect, assists terrorists. Second, these hoaxes often cause buildings and businesses to be evacuated and closed.").

McCaslan argues that no jury could find the mailings constituted a violation of the federal chemical weapons statute because the two letters underlying the charges against

11

him did not indicate violation of the chemical weapons statute or discuss the powder at all. Appellant's Br. (ECF No. 12) at 23–26 (hereinafter "Opening Br."). In essence, McCaslan argues that the mere act of including a powdery substance in a threatening letter that otherwise makes no mention of the substance or use of a biological agent, toxin, or chemical weapon is insufficient to prove that a reasonable person might believe the letter and its contents constituted a threat in violation of 18 U.S.C. § 1038(a)(1). *Id.*

The Government counters that explicit statements are not required because a jury could conclude that McCaslan's conduct intended to convey the false information that the envelope contained a dangerous chemical substance. Appellee's Br. (ECF No. 15) at 19–21 (hereinafter "Response Br.).

Despite McCaslan's contention, the plain language of the statute does not require an explicit reference to an attack. Rather, the statute focuses on a defendant's "conduct" and the "circumstances" of such conduct. 18 U.S.C. § 1038(a)(1).

Here, a jury could reasonably conclude that McCaslan's conduct—placing a white powdery substance into envelopes with a note containing hostile messages—intended to convey the false information that the envelope contained a dangerous chemical substance.[3]

___

[3] The evidence was sufficient to establish that McCaslan sent the threatening letters. McCaslan's DNA was found on the outdated 41-cent stamp affixed to the Rice Street letter. J.A. 552. Additionally, he knew the information regarding the warrants related to the Savannah Grill incident, but Kimberly did not. J.A. 593, 425–26. At trial, the Government also showed that McCaslan told Smith that Kimberly had been asking questions about him and observing Smith's house, allowing the jury to infer that McCaslan was preparing to frame Kimberly. *See* J.A. 263. Additionally, the letter to Hill was also posted with 41-cent stamps. And the information regarding the failed attempt to obtain a warrant related to the generator was only known by McCaslan—not Kimberly. J.A. 593, 425–26.

Further, a jury could also conclude that, under the totality of the circumstances, it was reasonable for Smith and Lee to see the white powdery substance, read the note, and believe that an attack was taking place. Under the totality of the circumstances, it was also reasonable for the United States postal worker who opened the second envelope at the P.O. box to see the white powdery substance, read the note, and believe that an attack was taking place. Indeed, the evidence showed that the recipients or interceptors of the letters thought the contents to be so potentially hazardous that emergency law enforcement was called, including the state bomb squad.

Given both the statutory language and the evidence presented at trial, we affirm the district court's denial of McCaslan's motion for acquittal.

### B. Evidentiary Objections

The court reviews a trial court's ruling on the admission of evidence for abuse of discretion. *United States v. McCabe*, 103 F.4th 259, 275 (4th Cir. 2024). For the reasons below, the district court did not abuse its discretion in overruling McCaslan's chain of custody and authentication objections regarding the Rice Street letter and the DNA evidence collected from it.

"The 'chain of custody rule' is but a variation of the principle that real evidence must be authenticated prior to its admission into evidence." *United States v. Howard-Arias*, 679 F.2d 363, 366 (4th Cir. 1982). "The purpose of this threshold requirement is to establish that the item to be introduced. . . is what it purports to be." *Id.* "Therefore, the ultimate question is whether the authentication testimony was sufficiently complete so as to convince the court that it is improbable that the original item had been exchanged with

13

another or otherwise tampered with." *Id.* The court has recognized that "a proponent need not establish a perfect chain of custody or documentary evidence to support their admissibility." *United States v. Vidacak*, 553 F.3d 344, 350 (4th Cir. 2009). "Indeed, the *prima facie* showing may be accomplished largely by offering circumstantial evidence that the documents in questions are what they purport to be." *Id.* The trial judge "must merely be able to conclude that the jury *could* reasonably find that the evidence is authentic, not that the jury necessarily *would* so find." *United States v. Davis*, 918 F.3d 397, 402 (4th Cir. 2019) (quoting *United States v. Recio*, 884 F.3d 230, 236–37 (4th Cir. 2018)).

Absent evidence of tampering, a missing link in the chain of custody will not prohibit the admission of evidence. *See Howard-Arias*, 679 F.2d at 365–66. In *Howard-Arias*, the court found no abuse of discretion when the trial court admitted drug evidence without testimony for transportation of the evidence. *Id.* The government called the Coast Guard officer who seized and tested the marijuana, the officer to whom he surrendered it, the United States Drug Enforcement Administration (DEA) custodian in Norfolk, and the DEA chemist. *Id.* The government did not call the officer who received the marijuana from the Coast Guard officer for transit to the DEA in Norfolk. *Id.* The court declined to disturb the district court's ruling because there was no evidence of tampering. *Id.*

McCaslan argues that without Hoover there were two material breaks in the chain of custody of the Rice Street letter: (1) transport from the scene to the Calhoun Falls Police Department and (2) from the Calhoun Falls Police Department to the SLED forensic laboratory. Opening Br. at 26–29. For the first alleged break in the chain, McCaslan notes that Smith did not accompany Hoover to the police department, Hoover did not wear a

14

body camera, and there was no documentation regarding the transport from Rice Street to the police department. *Id.* at 28. McCaslan argues that without this information, it is impossible to know whether the evidence bag was tampered with during transportation and whether it was in a substantially similar condition as when it was initially secured. *Id.* For the second alleged break in the chain, McCaslan argues that without Hoover's testimony the Government cannot show that the evidence bag found on Hoover's desk was the same bag used to collect the items at Rice Street. *Id.* McCaslan notes that the evidence bag was not initialed or dated and that the SLED agents who opened the bag to test the powder were not present when the items were first placed in the bag. *Id.* McCaslan also argues that the contamination of the envelope flap shows that the evidence was not in a substantially similar state when taken for DNA analysis and calls into question the reliability of the DNA sample collected from the stamps. *Id.* at 27.

But McCaslan's arguments miss the point, as they fail to show "that the original item had been exchanged with another or otherwise tampered with." *Howard-Arias*, 679 F.2d at 366 (citing *United States v. Brewer*, 630 F.2d 795 (10th Cir. 1980)).

More importantly, the Government introduced sufficient evidence to allow the jury to reasonably find that the evidence was authentic. While "precision in developing the 'chain of custody' is not an iron-clad requirement," *id*, the Government introduced, among other things, the testimony of Lee and Smith (the recipients of the letter) identifying the letter and explaining that Hoover took it in a sealed evidence bag; doorbell camera footage showing Lee receiving and reading the letter; photos of the letters taken by Lee and Smith; and testimony of the SLED agents who opened the evidence bag. J.A. 234, 242–43, 262–

15

63, 420, 774. Additionally, McCaslan was afforded wide latitude on cross-examination and closing arguments to call into question law enforcement investigative techniques and professionalism. J.A. 275, 340–41, 402–03. McCaslan cross-examined witnesses regarding the missing links in the chain of custody, including on the fact that Hoover was alone with the evidence on the trip from Rice Street to the police station. J.A. 160. This allowed the jury to weigh the credibility of the officers and the reliability of the evidence.

Accordingly, we will not disturb the district court's ruling on admissibility of the DNA evidence collected from the stamps.

### III. Conclusion

For the reasons stated above, we affirm the district court's denial of McCaslan's motion for judgment of acquittal and its evidentiary rulings regarding McCaslan's chain of custody and authentication objections.

*AFFIRMED*

16