Filed 8/31/21  P. v. Hicks CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>TIQUON RAMON HICKS, JR.,<br><br>     Defendant and Appellant.</td><td>A159863<br><br>(Solano County<br>Super. Ct. No. VCR233254)</td></tr>
</table>

Defendant Tiquon Hicks, Jr. was convicted of committing second-degree murder in connection with a criminal street gang, for an unprovoked shooting death that occurred in December 2017 on the streets of East Vallejo, California in broad daylight.  On appeal, he challenges his conviction solely on the basis of evidentiary error.  He contends the trial court abused its discretion by admitting various items of highly inflammatory and prejudicial evidence of his gang affiliation and contends the court erred by admitting improper expert opinion about some of the ballistics evidence.  He also raises two issues affecting his sentencing.

We reject his contentions and affirm the judgment.

## BACKGROUND

In November 2018, the Solano County District Attorney filed an indictment charging Hicks with three counts regarding the September 21, 2017 death of Demorio Williams.  Count one alleged that

1

Hicks, along with co-defendants Nickolas Howland and Steven Sanderson, murdered Demorio Williams.  (Pen. Code, § 187, subd. (a).[1])  Attached to the murder count were several gang-related firearm use allegations (§§ 12022.53, subds. (b), (c), (d) & (e)(1), 186.22, subd. (b)(1)).  Count two charged all three men with engaging in street terrorism on the day of the alleged murder (§ 186.22, subd. (a)), and count three charged Hicks with possession of a firearm by a felon on that day (§29800, subd. (a)(1)).  In a fourth count, Hicks was also charged with possession of a firearm by a felon four months later, on January 14, 2018, the date he was arrested.

Howland and Sanderson, Hicks's alleged co-participants in the Williams murder, also were charged with the January 13, 2018 gang-related murder of another victim (Coy Lacy, Jr.), which they allegedly committed together with a fourth defendant, Desean Johnson, another alleged gang member.  A fifth co-defendant, Damaria Haskins, was charged with the December 23, 2017 gang-related murder and attempted murder of two other victims (Erik Green and Eian Green), and assault with a semiautomatic firearm.

The charges against Hicks were severed, and he was tried separately before a jury in January and February 2019.  The prosecution contended Hicks, Howland and Sanderson were members of the 200 Westwood criminal street gang in East Vallejo and, acting together, murdered Demorio Williams. The prosecution presented evidence the murder took place about a month after Howland, in Hicks's presence, had accused the victim of stealing a gun from him, a theft that, according to the People's gang expert, would have been regarded as disrespectful toward the gang.  The prosecution contended

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

that about a month after that incident, at around 1 p.m., in an area of East Vallejo that was part of their gang territory, the three gang members emerged from an alleyway onto the street (the 100 block of Westwood Street) and then two, or possibly all three, began shooting into the passenger side of a car that was stopped in the street. The assailants then fled on foot through an alleyway and out of sight. The car's driver sped off to a nearby medical center, where efforts to revive the passenger-side occupant failed, and the victim, later determined to be Williams, was pronounced dead.

Several months later, on January 14, 2018, Hicks was arrested after Vallejo police conducted a legal search of him while he was a passenger in a car stopped at a gas station. They found him in possession of a Glock .9-millimeter semiautomatic pistol loaded with a high-capacity magazine containing 27 rounds of ammunition (located under his seat) and a second cartridge of .9-millimeter ammunition located inside a backpack on the floor in front of him. Subsequently, on the second day of trial, he pled no contest to the charge of illegal possession of a firearm by a convicted felon on that date.

At trial, the principal contested issue was whether Hicks, a 21-year-old, relatively short (5 feet 4 inches or 5 feet 5 inches ), dark-skinned African-American man weighing about 130 pounds, was one of the homicide assailants.

### 1.    Eyewitnesses

Four eyewitnesses testified. Two of them, a passerby in a vehicle and a neighborhood resident at home, witnessed the shooting itself. The other two, who were co-workers at a nearby market, overheard the shooting and witnessed its immediate aftermath.[2]

---

[2] We omit their names for confidentiality.

**The Passerby in a Truck:** The passerby testified that on the day of the homicide, she left home in her truck around 1:00 p.m. and turned onto Westwood Street, where she encountered a car stopped in the middle of the street, blocking her way. When she was about 20 feet away, she saw two men emerge from an alleyway between some apartment buildings, walking quickly and "with purpose," and begin shooting at the person sitting in the passenger seat. They were holding black, semiautomatic handguns. She testified that it seemed "like they completely unloaded their magazines" into the car, aiming for the passenger. It took about 10 seconds. Then, she saw the shooters run back down the same alleyway, and the car sped away. The entire encounter lasted about 15 to 20 seconds, including the 10 seconds it took the two shooters to discharge their guns. At first she tried to follow the fleeing car but quickly lost sight of it, then called 911 and returned to the scene to talk to police.

The passerby didn't recognize the shooters, and described them as dressed all in black, and wearing their black hoods pinched up to obscure their identities. She could see only their noses and their hands, and both shooters appeared to be light-skinned. She thought they were either White or Hispanic, although one shooter was possibly a very light-skinned Black person. Both were lighter-skinned than Hicks. One was about 5 feet 6 inches to 5 feet 9 inches tall; the other was a few inches shorter and a little chubby.

**The Neighbor:** The neighbor lived in a nearby one-story duplex, with his kitchen window overlooking Westwood Street about 55 feet from where the shooting took place. At around 1:00 o'clock in the afternoon, he looked through the open slats of the blinds on his kitchen window and saw three people standing by a car on the street, surrounding it from about 10 feet away. One person was standing at the front of the car, one in the middle and

4

one at the rear. All three pulled out guns and began shooting at the front of the car for about 10 to 12 seconds, and then they ran away down the "[s]ame alleyway that they're always by." The car sped off. From his vantage point it was hard to tell if they were aiming at the driver or the passenger side. On direct examination he estimated he heard about 30 shots, "it was a lot of shots." On cross-examination, he admitted he didn't really know how many shots were fired and that it could have been either 15 or 30. He didn't see anyone else when the shooting happened, and he didn't notice any truck.

The handguns they used all looked the same and were black.

The neighbor was "one hundred percent" certain there were three shooters and that Hicks was one of them.

The neighbor recognized all three people as soon as he saw them, because he had often seen them together in the neighborhood, in the general vicinity of his apartment building and nearby alleyways. The neighbor in fact told police he "hated" Hicks, because Hicks and his friends would often pull up in cars and block the neighbor's driveway or his neighbors' driveways or stand in their driveways.

The neighbor described one of the other shooters as "mixed race," with a hood pulled tight around his head, and at trial identified a photograph of Steven Sanderson as the second shooter with "absolute[] certain[ty]." The third shooter was a lighter-skinned Hispanic male whom he'd seen much less often than the other two shooters and was also wearing a hood, but the neighbor could see his face. At trial, the neighbor identified a photograph of Nickolas Howland as the third shooter.

When police talked to the neighbor on the day of the shooting, he lied and did not tell police what he saw because he feared the assailants might return to shoot him. After that, the neighbor spoke with the lead detective in

the homicide investigation, Detective Terry Schillinger, several more times, and each time he lied and said he hadn't seen anything because he didn't want to get involved and feared for his safety and that of his live-in girlfriend.[3] Finally, about a month or two after the shooting, the police reached out to him again and he was unwilling to tell them what he saw unless he received assurances for his safety. He testified he asked police to assist him in exchange for his talking to them, the police told him they might be able to help him move away from the area, and then he told police what he saw.[4] Detective Schillinger also told him the police would reach out to a realtor on his behalf.

The neighbor then identified Hicks, Sanderson and Howland from two six-person photographic lineups. Before trial, he also twice testified under oath that they were the three shooters he saw.

At the time the neighbor began cooperating with police, he was in a dispute with his landlord over some repairs, was not paying his rent and was in the midst of eviction proceedings. He also told police he hated commuting to his job in Berkeley because of the traffic and bridge tolls. The district attorney's office eventually paid him $3,350 through a state-funded witness relocation program, and he moved to "a nice apartment" elsewhere.

At trial, the neighbor denied that the relocation assistance was the reason he decided to cooperate with police, and testified he changed his mind about getting involved because it was "the right thing to do." The neighbor admitted on cross-examination he told Detective Schillinger he wanted to

---

[3] Neither the neighbor nor Detective Schillinger could recall the precise number and timing of their conversations.

[4] The neighbor testified on cross-examination that he disclosed what he knew *before* police said anything about possibly helping him relocate.

move because he hated the neighborhood, and possibly mentioned the fact that his rent had gone up and "it wasn't worth living there for that price."

The neighbor also admitted that, about three to five years earlier, he had fabricated a detailed lie to police about being kidnapped and robbed by a 24- or 25-year-old light-skinned Hispanic man and a similarly aged Black man while meeting some men to buy a car, when in fact two people had robbed him of about $4,000 in cash and then pistol-whipped him when he met up with them in a hotel room to buy drugs.

Detective Schillinger testified that no promises were made in exchange for the neighbor's cooperation. Prior to trial, Detective Schillinger had not known about the neighbor's earlier false police report. Detective Schillinger also acknowledged that the locations of bullet holes in the victim's car were inconsistent with the neighbor's account of the shooting, because they indicated all shots were fired from behind the car, not from in front of the car or from its side.

**Store employee A:** Store employee A was working on the day of the shooting at the Island Pacific Market, a nearby store with a rear door opening on to an alleyway near Westwood Street. He was near the back door with a co-worker when he heard around three gunshots. They peered out the back door to see what was going on, and store employee A saw three men running from the alley in their direction, toward the market. One person was holding a gun and then passed it to one of the other two. When store employee A and his co-worker saw the gun, they shut the door. Store employee A had seen all three people before.

When he talked to police a few days after the shooting, store employee A told police one of the men was a dark-skinned African-American

man, about 20 years old, about 130 to 140 pounds and about 5 feet 4 inches tall or 5 feet 5 inches.

He was shown photographs of approximately eight people who were "known" in the neighborhood that police had obtained from the security guard at Island Pacific Market. He picked out the photographs of Hicks and Sanderson as two of the people he'd seen. He also picked out two other people: Howland's brother, Jake Howland, who had been at work at the time of the shooting, and a White person named Matthew Hise who police didn't bother interviewing because, according to Detective Schillinger, store employee A said he might have misidentified Hise just because he'd seen Hise in the area and also because Detective Schillinger felt that store employee A had "identified Mr. Jake Howland more than Mr. Hise [and] I believe he got mistaken because he's seen both of those people in the same area before."[5]

At trial, store employee A identified a photograph of Sanderson as the person who had been holding the gun, and testified he'd seen that person many times before, most often in the nearby alley. He described the person to whom Sanderson had passed the gun as a Hispanic person he'd seen three or five times before, hanging out with Sanderson behind the Island Pacific Market, and, at trial, again initially misidentified a photograph of Jake Howland (whom police had eliminated as a suspect) as the second person before identifying a photograph of Nickolas Howland (Jake's brother) as the

---

[5] Unlike the neighbor, store employee A was not shown a six-pack photo lineup. Rather, store employee A picked Hicks's photograph out of a group of three photographs of Black males shown to him by police simultaneously.

Hispanic man he'd seen ("I think [so] . . . but I'm not sure").  Store employee A testified neither man was wearing a hood or anything on his face.

Store employee A recalled seeing the third person maybe once or twice before (he told police he'd seen the third person five times) and testified he could no longer recall that person very well.  He described the third person as a Black person who, unlike the other two, was wearing a hood and so store employee A couldn't see his face.  He did not recognize Hicks in court, could not recall whether he'd ever seen Hicks together with the other two people, could not recall identifying Hicks to police, and had not been able to identify Hicks as one of the three people when he testified under oath twice before.  In fact, at one of the two prior hearings, store employee A testified Hicks was not the third person.  Store employee A acknowledged his memory was fresh when he spoke to police and better than it was at trial, that what he told police had been true and that he was concerned for his safety as a witness.

**Store employee B:**  Store employee A's co-worker was called as a witness for the defense.  Store employee B testified that after he heard three or four gunshots, he saw two people walking down the alley as though nothing had happened and then he immediately went back inside the store.  Store employee B didn't see anyone running in the alley.  One person was an adult about 17 or 18 years old with a mustache, and one was about eight or nine years old; both were light-skinned or White.  One might have been Filipino.  Neither were wearing hoods.  The older person was holding a black gun and then gave it to the smaller person.

When store employee B was interviewed by police, he was shown no photographs.  He told police he was willing to try but that he didn't think he could identify the people.  He testified he wouldn't be able to recognize the suspects in photos because he didn't know them very well.  Detective

9

Schillinger testified that after store employee B gave police a description of what he saw, Detective Schillinger opted not to show store employee B any photos because of a language barrier.

## 2. Ballistics evidence

The day after the murder, police searched the home of Hicks's girlfriend and found a .40-caliber bullet as well as evidence that Hicks had been there (i.e., a medicine bottle and a probation hearing notice, both bearing his name).

Ten spent cartridge casings were found at the crime scene. Bullets were also recovered: one at the crime scene, an unspecified number from the victim's car along with some bullet fragments, and two from the victim's body.

The People's ballistics expert, Eugene Banga-An, testified that all six bullets he examined were .40-caliber, fired from two different guns (three bullets from each). Banga-An also examined two bullet cores that were recovered but was unable to determine their caliber because they were deformed. We discuss that aspect of his testimony further below.

All 10 cartridge casings were .40-caliber and were fired from the same gun. However, he testified it is not possible to compare spent cartridge casings with fired bullets to determine whether the casings and bullets were fired from the same gun. He also testified that since all the shell casings were from one gun, yet bullets from two guns were identified, some shell casings were missing.

On cross-examination, Banga-An expressed the opinion that there could have been two or three guns involved. The reason was because he identified two groups of bullets fired from two different guns and one group of spent cartridge casings fired from one gun, and since there was no way to

ascertain whether the casings were associated with the bullets, the casings might have been from a different gun.

During the defense case, Banga-An acknowledged he made no mention of a third gun in his report and testified previously that two guns were used.

The defense also introduced evidence of DNA testing. A DNA sample could be obtained from only one of the 10 shell casings, and it did not match Hicks's DNA, or Howland's or Sanderson's. The defense expert acknowledged that if the casing fell to the ground it could pick up trace amounts of DNA from other things on the ground, or the DNA could have been left by someone who touched the unfired bullet months earlier.

### 3. Jail Calls

The prosecution introduced evidence of several video calls that Hicks had while in jail awaiting trial.

In one, Hicks appears to be discussing contact by his friends with one of the eyewitnesses from the Island Pacific Market (instructing his callers at the beginning, "don't say no names"). There is no mention of threats, violence or coercion but there is a reference to someone having spoken with "that boy," and to someone having "posted him." One of the callers also asked, "'Cause of that he's in there—'cause of him, am I right?," to which Hicks responded with profanity ("what the fuck?"). Detective Schillinger testified that, based on the content of this call, he believed someone associated with Hicks had contacted store employee A.

Several other video calls were relied on by the People's gang expert, whose testimony we next briefly discuss.

### 4. The People's Gang Expert

Detective Jason Thompson, a police officer with the City of Vallejo assigned to the Solano County/FBI Violent Crime and Gang Task Force, was

11

qualified as an expert in the area of criminal street gangs and testified for nearly three days. He testified about the background and origins of the 200 Westwood street gang, which began to surface after two murders in East Vallejo (the 2015 murder of Kenneth Max Rusk, known to his friends as "Bread," and the 2016 murder of Eric Reyes), when police began noticing increasing amounts of graffiti in the alleyways behind the Island Pacific Market and an uptick in crime in the area. He also testified about his investigation into the gang's existence, beginning in January 2018 (primarily through social media); the gang's symbol; and the gang's various names. Ultimately, he opined that Hicks, Nickolas Howland, Steven Sanderson and two others (Desean Johnson and Damaria Haskins) are all active members of the 200 Westwood gang, that the gang's primary activities are illegal weapons possession and assault, and, based on a case-specific hypothetical, that the murder of Demorio Williams was committed for the gang's benefit.

Detective Thompson based his opinions on multiple sources. These included about 15 photographs retrieved from cell phones belonging to Nickolas Howland, Desean Johnson and Steven Sanderson; photographs of Howland's gang tattoos taken by Detective Thompson; a YouTube music video that Detective Schillinger located online that was shot in one of the breezeways on Westwood Street, which we discuss further below; photographs of gang graffiti in the neighborhood; photographs of gang graffiti and various items paying homage to murder victims Kenneth Max Russ and Eric Reyes, taken during a search of Nickolas Howland's bedroom; and criminal histories of some of the gang's alleged members, including Hicks.

He also based his opinion on screenshots and footage from video calls that Hicks made while in jail awaiting trial (referred to at trial as "iWeb videos"). In one jail video call, a young woman showed Hicks a picture on her

12

phone of him and three others (Desean Johnson, Damaria Calvin and Nickolas Howland), taken in a breezeway off Westwood Street, all displaying gang signs and in which Hicks was pointing a gun at the camera. In another jail video call, Hicks was displaying the gang's hand sign and said, "Gang shit, gang shit." And in another, according to Detective Thompson's interpretation of the slang Hicks uttered, Hicks mentioned shooting a gun when he gets out of jail.[6]

## 5.     The Jury's Verdict

After a day-and-a-half of deliberations, the jury found Hicks guilty of second degree murder (§ 187, subd. (a)) and found true the enhancement allegation that the murder was gang-related (§ 186.22, subd. (b)(1)). The jury found not true the enhancement allegation that he personally used or discharged a firearm in connection with the murder (§§ 667.5, subd. (c)(8), 12022.53, subd. (c), 12022.53, subds. (d), (e)(1)). It also found him not guilty

---

[6] In that call, Hicks told the young woman with whom he was speaking to post him on Instagram and social media. Toward the end of their conversation, he appears to be dictating a message to her, and she appears to be typing into her phone as he speaks. Hicks dictated what sounds like the following words: "Free young pooty, n---a, aka, tq n---a, I'll be back, n---a, firing a hot one, n---a, lettin n---as know, n---a, straight up, n---a, and while we, n---a, n---a, free the real one, n---a, straight up, n---a, hah."

"Pooty" is Hicks's nickname. Detective Thompson testified that "firing a hot one" refers to firing a gun.

Asked on cross-examination whether Hicks said "fighting" a hot one rather than "firing" a hot one, in the sense of contesting criminal charges, Detective Thompson testified "no." He explained, "I'm pretty clear on what [Hicks] said, and he said firing." He also testified that, in context, it wouldn't make sense to say "fighting" a hot one because Hicks also said, "I'll be back," and "in the full context of that statement, that would mean him being back on the streets."

of possession of a firearm by a convicted felon on the date of the murder. It found him guilty of street terrorism (§186.22, subd. (a)).

Hicks was sentenced to state prison, and this timely appeal followed.

## DISCUSSION

### I.

### *Evidence of Hicks's Possession of a .9-Millimeter Gun*

Hicks's first claim of error is the trial court abused its discretion by admitting the evidence of his possession of a .9-millimeter weapon and a loaded ammunition cartridge on the day of his arrest. Because the gun was "not identified as the same caliber as the murder weapons," he argues, the evidence was irrelevant and highly prejudicial.[7] It amounted to inadmissible character evidence, he contends, barred by Evidence Code section 1101. The People argue this evidence was properly admitted, because the .9-millimeter gun might have been used during the commission of the crime, which is the basis upon which the trial court deemed it relevant and admissible.

We review the court's evidentiary rulings for abuse of discretion. (*People v. Cox* (2003) 30 Cal.4th 916, 955 (*Cox*).)

The applicable legal standard was articulated by the California Supreme Court in *People v. Riser* (1956) 47 Cal.2d 566 (*Riser*).[8] "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. [Citations.] When the

---

[7] This issue was preserved, both prior to trial and at trial in the defense's motion for a mistrial.

[8] Overruled on another ground, *People v. Morse* (1964) 6 Cal.2d 631.

14

prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Id*. at p. 577.)

So, for example, applying this principle in a murder prosecution where the victims' causes of death could not be determined, the Supreme Court in *People v. Cox* upheld the admission of evidence of three guns found in a search of defendant's car around the time of the discoveries of the victims' bodies.[9] (See *Cox, supra,* 30 Cal.4th at pp. 927, 955.) Despite the fact there was no evidence the guns had been used in the killings, the Supreme Court held that the guns were relevant (among other reasons) as possible murder weapons, because it was not known how the three victims were killed. (*Id*. at pp. 956-957.) The Supreme Court noted the prosecutor argued the evidence suggested the victims had been stabbed, but "such argument did not preclude the reasonable possibility that one or all three of the victims had been shot," which was one basis upon which the prosecutor had sought to admit the evidence. (See *id*. at p. 956.) Accordingly, there was no error.

As the Supreme Court more recently encapsulated this rule, "[I]t is generally error to admit evidence that the defendant possessed a weapon that *could not have been* the one used in the charged crime." (*People v. Sanchez* (2019) 7 Cal.5th 14, 55, 56, italics added [upholding admission of evidence that shortly before murders defendant possessed a firearm that "could have

---

[9] The three victims all disappeared and their bodies were then discovered within about a four-and-a-half-month period. The guns were found in defendant's possession several months after the disappearance of two victims, and within days of the third victim's disappearance but several months before her body was found. (See *Cox, supra,* 30 Cal.4th at pp. 927, 955.)

15

been the murder weapon"]; see also, e.g., *People v. Homick* (2012) 55 Cal.4th 816, 876-877 [no error to admit evidence defendant habitually carried a revolver based on offer of proof that it "may have been" same type of weapon used in the shooting]; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052 [no error to admit evidence defendant kept a gun of unspecified type in his van; although evidence "did not establish the gun necessarily was the murder weapon, it might have been . . . The evidence was thus relevant and admissible as circumstantial evidence that he committed the charged offenses"].)

One of the principal authorities Hicks relies on, *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, illustrates the same point. In that case, the Ninth Circuit *upheld* the admission of evidence the defendant possessed a weapon that could have been used in the crime. In *McKinney*, a murder prosecution involving a knife stabbing, the weapon was never identified and could have been almost any kind of knife. (*Id.* at p. 1381.) The Ninth Circuit held the district court erred in admitting evidence the defendant at one point owned a particular knife (a "Gerber" knife) that could not possibly have been the murder weapon, because it indisputably was not in his possession on the day of the murder (previously it had been confiscated by police). (See *id.* at p. 1382.) But the Ninth Circuit held the lower court had *properly* admitted evidence the defendant possessed another knife (a "Tekna" knife) several months before the murder. (*Id.* at pp. 1383-1384.) There was conflicting evidence of the dates he possessed the latter knife. (*Id.* at p. 1383.) The prosecution argued that if the jury believed he had that knife seven weeks before the murder, the jury also could infer he had the knife in his possession on the day of the murder, used it to commit the crime and then hid it. (*Id.* at pp. 1383-1384.) Noting in dicta that "this evidence may have been more

16

prejudicial than probative and, thus, inadmissible under California evidence law," the Ninth Circuit held that the evidence was relevant and not inadmissible propensity evidence barred by federal law. (*Id*. at p. 1384.) It explained, "[b]ecause the evidence that [defendant] had a Tekna-like knife in his possession soon after Thanksgiving makes a fact of consequence, his identity as the murderer, more probable, its admission was not in violation of the historically grounded rule against the use of "other acts" evidence to prove character." (*Id*. at p. 1384.) The Ninth Circuit observed, "It is not evidence of another act, but of a simple fact: whether [defendant] was the owner of a knife on the date of the murder." (*Id*. at p. 1383.)

By contrast, in the cases Hicks cites that held it was error to admit evidence of a weapon found in the defendant's possession, the evidence (and/or theory of the prosecution) conclusively foreclosed the possibility that the challenged weapon was used in the commission of the offense. (See *Riser*, *supra*, 47 Cal.2d at pp. 576-577 [where evidence established that bullets found at scene had been fired from a Smith and Wesson-brand .38 revolver, it was error to allow evidence of defendant's possession of loaded Colt-brand .38 revolver, holsters and .22-caliber shells when he was arrested]; *People v. Prince* (2007) 40 Cal.4th 1179, 1248 [*Riser* held it was error to admit evidence defendant possessed a gun that "could not have been the murder weapon"]; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1043-1044, 1056 [error to admit evidence that one year before murders defendant possessed a gun similar to the murder weapon but a different color, because the prosecution did not claim it was the murder weapon]; *People v. Henderson* (1976) 58 Cal.App.3d 349, 359-360 [error to admit evidence defendant possessed a loaded gun when "[t]here is no contention that the loaded Derringer was used by the defendant in connection with the charged offense"].)

17

Here, there was no error.  Unlike in the cases Hicks cites, the evidence in this case did not conclusively establish the specific types and calibers of all the weapons used.  The ballistics evidence established that two different .40-millimeter guns were used and that some of the ballistics evidence was  too deformed to be identified (specifically, two bullet cores).  Furthermore, one eyewitness (the neighbor) testified he saw three people firing weapons, including Hicks.  The third gun, if the jury believed there was one, thus could have been of any caliber.  Moreover, the neighbor testified all three guns he saw were black, just like the gun recovered from Hicks when he was arrested.  The neighbor's eyewitness identification, to be sure, was weak, and he had significant credibility issues.  But "[r]elevance is a low threshold." (*People v. Battle* (2021) 11 Cal.5th 749 [2021 WL 2698228, at p. *28].)  And " '[t]he trial court has broad latitude in determining the relevance of evidence.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1073.)  In these circumstances, the trial court did not abuse its discretion in concluding Hicks's possession of a gun months later was probative of his commission of the crime.  Since the use of the .9-millimeter gun could not be ruled out as a murder weapon, its admission was proper.

Hicks argues *Cox* (and other like authorities) are distinguishable, because in those cases "the proximity of the firearms in both time and distance from the crimes supported their relevance," whereas here Hicks "possessed a weapon four months after the shooting, at a different location that was never linked with the murder weapon."  But Hicks has not demonstrated such distinctions establish an abuse of discretion.  At most, the lapse of time and the location where he was arrested in possession of a gun affected the weight of that evidence not its relevance and were merely factors

for the jury to consider.[10] (See, e.g., *People v. Nakis* (1920) 184 Cal. 105, 113-114 [upholding admission of evidence of pistol found in defendant's possession when arrested; "[t]he fact that a period of three weeks had elapsed between the date of the murder and the time of the arrest might affect the weight of this particular evidence, but would not render it incompetent"].)

Even if there had been an abuse of discretion, moreover, it would be harmless, whether reviewed for federal constitutional error (see *Chapman v. California* (1967) 386 U.S. 18) or ordinary state law error (see *People v. Watson* (1956) 46 Cal.2d 818, 836). The jury found Hicks did not possess or discharge a weapon on the day of the murder, and so the jury clearly rejected the prosecution's theory that the .9-millimeter gun found in his possession was used during the commission of the murder. And we also are convinced beyond a reasonable doubt this evidence did not affect Hicks's conviction on the People's alternative theory for aiding and abetting the murder because there was extensive other, admissible evidence of Hicks's possession (and indeed, glorification) of firearms and regular association with others who also possess firearms.[11]

To start with, there is no argument that any error affected the jury's findings that Hicks was a member of the 200 Westwood gang or that the murder was committed for the gang's benefit. And it was undisputed that one of the 200 Westwood gang's signature offenses is illegal gun possession. Therefore, even without proof that Hicks possessed a firearm on the day he

---

[10] Hicks was apprehended with the gun at a Chevron gas station located at 400 Lincoln Road East in Vallejo, in a car with two other people. The record does not reflect the gas station's proximity to the crime scene.

[11] The parties agree the jury convicted Hicks on the People's alternative theory that he aided and abetted the murder.

was arrested, the jury likely would infer that Hicks possessed weapons or at a minimum that he condoned and associated with those who did.

In addition to the fact of his gang membership, there was extensive, undisputed evidence that the other gang members carried weapons. The jury saw three photographs of fellow gang members with guns (Nickolas Howland, Damaria Calvin and Steven Sanderson), including one that includes Hicks who is flashing a gang sign. In addition, two fellow gang members had prior weapons offenses: Nickolas Howland, who had two convictions for carrying a loaded firearm in public, and Damaria Haskins, who was convicted of carrying a loaded concealed weapon in a vehicle. And one witness (Anthony Smith) put Hicks at the scene of the confrontation between Sanderson and the murder victim concerning the subject of a gun, which Sanderson accused the victim of stealing.

There also was circumstantial evidence Hicks himself possessed a gun and was prone to using it. Ammunition was found in a search of his girlfriend's home, where police also found traces of Hicks's personal belongings. And in a jail video call—which the jury asked to re-watch during deliberations—*he made statements the jury could construe as a promise to shoot a gun when he returned to the streets.*

Thus, quite apart from the challenged evidence that Hicks possessed a semiautomatic weapon on the day he was arrested, there was extensive admissible evidence from which the jury could infer both that he possessed a weapon himself and that he regularly associated with others who did so. The admission of the gun possession evidence thus "added little to the jury's knowledge gained from evidence correctly admitted." (*Riser, supra,* 47 Cal.2d at p. 577 [error in admitting evidence of defendant's possession of weapon that could not have been murder weapon held harmless, where jury would

20

have concluded from other properly admitted evidence that defendant possessed firearms]; see also, e.g., *People v. Cole* (2004) 33 Cal.4th 1158, 1195 [any error under Evidence Code section 1101, subdivision (a) in admitting evidence defendant abused his girlfriend on two prior occasions in prosecution for murder held harmless under both *Watson* and *Chapman*, where there was "abundant" other evidence that defendant and victim had an acrimonious relationship]; *People v. Leon* (2008) 161 Cal.App.4th 149, 170 (*Leon*) [error in admitting evidence of uncharged offense held harmless in light of "strong evidence" defendant committed offenses in association with criminal street gang and with intent to promote, further, or assist gang members' criminal conduct].)

Hicks stresses that the challenged evidence improperly "bolstere[d] an extremely weak eyewitness identification case," but that contention is beside the point (and unnecessary to address) because, to put it plainly, the challenged evidence was clearly cumulative of abundant other, properly admitted evidence of Hicks's affinity for guns.

For these reasons, we conclude beyond a reasonable doubt that the admission of this evidence—i.e., that Hicks possessed a firearm that the jury ultimately concluded he had *not* used in the murder—did not persuade the jury he aided and abetted the murder committed by those who did fire the deadly shots.

## II.

### *Hicks's Prior Criminal Conduct*

Next, Hicks argues the trial court abused its discretion by admitting evidence of his prior conviction for assault.  This evidence came in through the testimony of Detective Thompson, the People's gang expert, who authenticated a certified court record of Hicks's conviction which was

21

admitted into evidence, and testified it reflected that, on April 18, 2017, Hicks was convicted of committing "assault leading to or potentially leading to grave bodily injury or harm" in violation of section 245, subdivision (a)(4), a felony, for an offense committed on December 2, 2015.[12]  Detective Thompson's testimony on the subject was extremely brief, and no details of the offense were introduced.

Hicks contends this evidence should have been excluded under Evidence Code section 352 because it was cumulative of other gang evidence and unduly prejudicial.  Relying principally on *Leon, supra,* 161 Cal.App.4th 149, which held a trial court had abused its discretion in admitting evidence of a prior predicate offense committed by the defendant, he asserts:  "there was voluminous independent evidence that 200 Westwood was a criminal street gang; that appellant was a gang member; and that the gang engaged in a pattern of gang activity.  The prosecution had certified records of other predicate acts committed by other Westwood gang members to meet the requirement of proving 'two or more' predicate acts.  Appellant's prior assault conviction was by far the most prejudicial of all the predicate acts because it involved appellant's prior act of violence. [¶] . . . . [and] was thus cumulative to other less inflammatory evidence of facts that were not reasonably in dispute." [13]

---

[12]  The certified record (People's Exhibit 29) consisted of the information, which charged Hicks with committing second degree robbery (§ 211) on December 2, 2015, and the minute order of the sentencing hearing, which placed him on three years of probation for violating section 245, subdivision (a)(4).

[13]  We are troubled by the lack of any citations to the record for these assertions.  We could deem the point forfeited on that ground, but we have elected ourselves to review the record.

This issue has been forfeited.  To his appellate counsel's credit, Hicks acknowledges he did not object in the trial court to this evidence under Evidence Code section 352.  He asks us to exercise our discretion to consider the issue anyway, contending the objections he did raise were sufficient to preserve the issue because they required the trial court to engage in the same analysis as that required by Evidence Code section 352 (see, e.g., *People v. Cole, supra,* 33 Cal.4th at p. 1195, fn. 6 [considering claim raised for first time on appeal that admission of prior acts evidence deprived defendant of a fair trial and thus violated federal constitution, where defendant objected to its admission under Evidence Code section 352].)

We do not agree.  When the trial court overrules an objection, "the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial.  A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 438, fn. 5.)  Put another way, a party may assert for the first time on appeal only that an asserted error in overruling his stated objection had an additional *legal consequence*; i.e., that an alternative legal principle not mentioned below supported the specific reason he gave as to why the evidence should be excluded.  He may not argue that a newly raised point of law required exclusion of the evidence for reasons other than those articulated in his trial objection.  (See *id*. at p. 435.)  Here, Hicks did not argue that evidence of his prior conviction was cumulative nor did he ask the trial court to weigh the potential prejudicial impact of this evidence against its probative value; he asserted only that his prior conviction was inadmissible as a matter of law because it pre-dated the gang's formation

23

and, later, that the certified record of his conviction did not include the date of his offense and thus was irrelevant.  Neither objection touched on the concerns now raised on appeal; namely, that the evidence of his prior conviction was cumulative and unduly prejudicial.  The People had no opportunity to respond to such a theory.  And the trial court did not consider such factors when it considered and ruled on defendant's objections.  Simply put, Hicks's appellate argument does not "merely restate[], under alternative legal principles, a claim otherwise identical" to the one he made below. (*People v. Yeoman* (2003) 31 Cal.4th 93, 117.)

Even had the issue not been forfeited, moreover, we would conclude there was no error.  As Hicks acknowledges, this issue is governed by our Supreme Court's decision in *People v. Tran* (2011) 51 Cal.4th 1040 (*Tran*), which held that in a prosecution for participation in a criminal street gang, a predicate offense may be proved by evidence of the defendant's criminal conduct on another occasion, and that such evidence, although it is "inherently prejudicial," is subject to exclusion under Evidence Code section 352 only if its probative value is substantially outweighed by its prejudicial effect.  (*Tran,* at pp. 1046-1047.)  In addressing how Evidence Code section 352 affects the admissibility of such evidence, the Supreme Court held the prosecution is not required to "sanitize" its case by limiting its evidence to predicate offenses committed by other gang members, and that when such evidence is argued to be cumulative, the trial court must perform its traditional function of weighing the evidence's probative value against its prejudicial impact.  (See *Tran,* at pp. 1048-1049.)  The Court also offered guidance for conducting such an inquiry.  It observed that "although the court need not limit the prosecution's evidence to one or two separate offenses lest the jury find a failure of proof as to at least one of them, the probative value

of the evidence inevitably decreases with each additional offense, while its prejudicial effect increases, tilting the balance towards exclusion. And the trial court of course retains discretion to exclude details of offenses or related conduct that might tend to inflame without furthering the purpose for admitting the evidence." (*Id*. at p. 1049.)

In *Tran*, the Supreme Court upheld the admission of evidence of the defendant's prior criminal conduct as a predicate offense as a proper exercise of discretion under Evidence Code section 352. (*Tran, supra,* 51 Cal.4th at p. 1050.) In that case, a prosecution for a gang-related murder and attempted murder, the prosecutor presented evidence of five other predicate offenses in addition to the defendant's past criminal conduct: the charged murder of one victim, the charged attempted murder of a second victim, and evidence that a fellow gang member was convicted of offenses arising from the shooting of three other people. (*Id*. at pp. 1045-1046, 1050.) The Supreme Court upheld the trial court's exercise of discretion also to admit, over defendant's objection, evidence of past extortion activities defendant had engaged in with other gang members, including situations in which shots had been fired into some businesses and other businesses had been threatened, and for which the defendant had suffered a felony extortion conviction (see *ibid*.). The Supreme Court reasoned that the challenged evidence was "highly probative" on a number of issues including as a predicate offense, and that because it predated the charged crime by several years its probative value was "enhanced because the evidence emanated from independent sources that could not have been influenced by knowledge of the charged offenses." (*Id*. at p. 1050.) In addition, the challenged evidence "*was not particularly cumulative and certainly not so cumulative as to lack probative value.*" (*Ibid*., italics added.) By contrast, it was not unduly prejudicial,

because the defendant had suffered a conviction and so "there was little danger of confusing the issues by requiring the jury to determine if defendant was guilty of both the charged offenses and the [prior offense,] and no risk the jury might convict defendant to prevent him from escaping punishment for the [prior offense]." (*Ibid*.) The evidence also was less inflammatory than the testimony about the charged murder and attempted murder. (*Ibid*.) Despite testimony that shots were fired during the past extortions, "there was no evidence anyone was killed or injured or that *defendant* personally shot at or threatened anyone." (*Ibid*.) The trial court also gave a limiting instruction. (*Ibid*.) In these circumstances, the Supreme Court concluded that the probative value of the evidence "far" outweighed its prejudicial effect and thus the trial court did not err by admitting it. (*Ibid*.)

Judged by the principles discussed in *Tran*, there was no abuse of discretion here. As in *Tran*, evidence of Hicks's assault conviction was not unduly cumulative "and certainly not so cumulative as to lack probative value." (*Tran, supra,* 51 Cal.4th at p. 1050.) Here, besides Hicks's past conviction and the Williams murder itself, there was evidence of three other predicate offenses: evidence Nickolas Howland was convicted of carrying a loaded firearm in public on two prior occasions (on October 28, 2015, and June 22, 2016) and evidence Damaria Haskins was convicted of carrying a loaded concealed weapon in a vehicle (on December 21, 2016). This is comparable to the number of predicate offenses involved in *Tran*. (See *ibid.* [defendant's prior offense admitted despite evidence of two charged offenses and three other predicate offenses]; see also *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1435-1436 [no abuse of discretion in admitting evidence of six prior predicate offenses]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1138-1139 [no abuse of discretion in admitting evidence of eight prior

26

predicate offenses]; cf. *Leon, supra,* 161 Cal.App.4th at pp. 166, 169 [pre-*Tran* decision characterizing evidence of defendant's prior offense as cumulative, where the People did not argue that evidence of three other predicate offenses "were in any way insufficient to establish the necessary predicate offenses"].)

Nor was the evidence of Hicks's assault conviction unduly prejudicial. As in *Tran,* because Hicks was convicted of the prior offense, there was no risk the jury might convict him of the Williams murder to ensure he did not escape punishment and there was little danger of confusing the issues. (See *Tran, supra,* 51 Cal.4th at p. 1050.) And, as in that case, the evidence of his prior assault conviction was considerably less inflammatory than the evidence of the Williams murder. (See *ibid.*) Despite the fact Hicks was convicted of assaulting someone, "there was no evidence anyone was killed or injured." (*Ibid.*) Indeed, unlike in *Tran,* the jury did not hear any details of Hicks's prior crime; all it received was evidence of the bare fact of his conviction. By contrast, in *Leon,* relied on by Hicks, where the appellate court said the challenged evidence of defendant's past criminal conduct carried a "high" likelihood of prejudice (see *Leon, supra,* 161 Cal.App.4th at p. 169), the challenged evidence (a prior robbery) was not less inflammatory than the charged offense (for burglary and related offenses stemming from a car break-in) and, moreover, was quite similar to the charged offense. Evidence of the defendant's prior crime thus posed a high degree of risk the jury would consider it as evidence of his propensity to commit the very same type of crime of which he stood accused. Here, apart from the fact that both were crimes of violence, there was no similarity between the rather sterile and quite limited evidence of Hick's prior assault and the present murder charge.

The probative value thus outweighed its prejudicial effect, and the trial court would not have abused its discretion in admitting this evidence had defense counsel asked the court to exclude it under Evidence Code section 352.

### III.

### *The YouTube Video*

Next, Hicks challenges the admission of the YouTube rap video that Detective Schillinger located online, which was filmed in a breezeway off Westwood Street. Citing cases from California and other jurisdictions in which rap videos or lyrics were held to be improperly admitted as unduly prejudicial (*People v. Coneal* (2019) 41 Cal.App.5th 951 (*Coneal*); *United States v. Gamory* (11th Cir. 2011) 635 F.3d 480 (*Gamory*); *State v. Skinner* (2014) 218 N.J. 496 (*Skinner*)), he again argues it was cumulative of other gang evidence and unduly prejudicial, and thus should have been excluded under Evidence Code section 352.

### A.    Background

The YouTube video, which is nearly two minutes long and was played without sound, consists mostly of lengthy close-up images of Nickolas Howland singing alone, interspersed with quick, crowded group shots of Howland singing in an alleyway while accompanied by other people around him. It concludes with an image of Howland wearing a t-shirt that says "Max World," followed by footage of a flower-covered gravesite. In many of the shots, including some of the group shots, Howland is holding what appears to be a gun while he sings, sometimes pointing it at the camera or touching it to his face. In a few of the images, Desean Johnson, who is wearing a grey hoodie sweatshirt, is holding what appears to be a gun. Based on our independent review of the video, Hicks appears briefly in some of the crowd

28

shots in the alleyway, fewer than 10 times and overall for less than 15 seconds. In about three of the quick glimpses of Hicks, somebody else can be seen holding what appears to be a gun. Hicks himself does not appear in the video holding any weapon (nor does he contend otherwise). At times, some of the people in the video are holding cash or other objects; some can briefly be seen smoking what could be marijuana.[14]

The prosecution offered the video both to prove the existence of the gang and its membership, and to corroborate eyewitness testimony that Hicks, Sanderson and Howland frequented the alleyways of Westwood Street adjacent to the scene of the murder. As the prosecutor explained the latter point, a material issue in the case was the "it wasn't me defense; . . . that this eyewitness completely fabricated, I guess, what he saw. So anything I can show, not just, oh, I saw him out there; but actual visual representations for the jurors to see these three individuals, in particular, in that Westwood breezeway is relevant. And it's really relevant in this case because it's not even a case where they're saying mistaken identity. They're saying . . . it's not my guy."

The video was admitted over Hicks's objection under Evidence Code section 352. The court ruled it was relevant as to "the fact that these are people who are depicted in the video know each other, that they are in the alley that is the alleged gang turf of 200 Westwood, that they are present,

_____

[14] Outside of the jury's presence, the trial court observed, "there were people holding money, and it was hard to tell if people were smoking things that could have been marijuana. I don't know. There were people holding bags or a box, perhaps it was marijuana inside that. I'm not certain." From our independent review of the video, it does appear that some people are smoking what could be marijuana. However, there is no basis for a lay juror to conclude that the container-like items several people can briefly be seen holding, whose contents are obscured, contained drugs.

give the 200 Westwood sign, and they have participated in the video that purports to be a tribute to fallen members of their criminal street gang," and concluded that its probative value outweighed its prejudicial impact. Prior to its admission, the trial court offered the defense an opportunity to play any portion of the sound it wished, and defense counsel declined. Over the defense's objection, the court declined to play the beginning portion of the video which included a written disclaimer on the screen stating that the guns in the videos were props, on the ground that the disclaimer is inadmissible hearsay. The court ruled it would allow the defense to ask the People's gang expert if the guns appeared to be real, but the defense declined to do so.

Detective Schillinger testified he located the video online, and it was played for the jury. Detective Schillinger identified Nickolas Howland, Hicks, Sanderson and Desean Johnson in the video, testified the video was taken in one of the breezeways on Westwood Street that "we have been talking about," and pointed out that one person was wearing a shirt that said "Max World" and another part of the video said, "Rest in peace, Max. R-I-P." Detective Schillinger did not testify about the guns depicted in the video.

The video was played again during the direct examination of the People's gang expert, Detective Thompson, who testified very briefly about it. Detective Thompson opined it was relevant to his determination of the gang's existence, because it appeared to be a memorial to Kenneth Max Rusk, he observed the 200 Westwood gang sign being flashed, the video depicted Hicks, Howland, Johnson and Sanderson, and most of its scenes were filmed in the breezeways near the 100 block of Westwood Street. The prosecutor did not elicit any testimony from Detective Thompson about the guns. Only defense counsel did so, during cross-examination when he elicited testimony that Desean Johnson is pictured in the video holding a gun. Detective

30

Thompson also acknowledged on cross-examination that Nickolas Howland is an aspiring YouTube rap musician who puts out music videos under the nickname "4nic."

### B. Analysis

Even when evidence of gang membership is relevant to an issue in dispute, trial courts must " 'carefully scrutinize' " such evidence before admitting it, because it may have a highly inflammatory effect on the jury. (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.) " '[T]he prosecution has no right to present cumulative evidence [of gang affiliation] which creates a substantial danger of undue prejudice to the defendant.' " (*People v. Cardenas* (1982) 31 Cal.3d 897, 905.) "The risk of injecting undue prejudice is particularly high in cases where the prosecution has *not* charged a gang enhancement and the probative value of the gang evidence is minimal." (*People v. Flores* (2020) 9 Cal.5th 371, 402, italics added, citing *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) "On appeal, we review for abuse of discretion a trial court's ruling on whether [such] evidence is relevant, not unduly prejudicial, and thus admissible." (*McKinnon*, at p. 655.) " ' "The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason." ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 33.)

Hicks does not contend that the YouTube video was irrelevant but that it was cumulative of other gang evidence and should have been excluded as unduly prejudicial. Citing several cases in which rap videos or lyrics were held to be improperly admitted as unduly prejudicial, one from California and two from other jurisdictions (*Coneal, supra,* 41 Cal.App.5th 951; *Gamory*, *supra*, 635 F.3d 480; *Skinner, supra,* 218 N.J. 496), he argues that "the visual portion of the video, showing gang members in the breezeway with firearms

31

cash and marijuana, 'could reasonably be understood as promoting a violent and unlawful lifestyle,' " whereas other independent evidence of the gang's formation and Hicks's membership in it was far less prejudicial.

The trial court did not abuse its discretion in allowing the silent YouTube video to be played. Hicks does not explain in what manner the evidence was cumulative to other gang evidence but merely asserts that it was. "Absent an analysis of specific evidence, reference to volume alone is meaningless." (*Coneal*, *supra*, 41 Cal.App.5th at p. 963.) Furthermore, although the video might have been cumulative as to the gang's existence and its membership (the People do not respond to Hicks's conclusory argument on that point), it was probative and thus directly relevant for another reason as well: to corroborate *as photographic proof* that Hicks and his fellow alleged gang members hung out in the Westwood alleyways, and thus, as the prosecutor argued below in his offer of proof, corroborated eyewitness testimony. In particular, it corroborated the testimony of the neighbor, whose credibility was thoroughly attacked at trial, that he'd seen the perpetrators in the neighborhood many times before, including in the alleyway near his apartment. And it corroborated store employee A's credibility, who testified he'd seen two of the perpetrators several times before, including one of them "many" times. And, indeed, the trial court alluded to that theory of admissibility in its ruling, observing that the video was relevant in part because it showed that the gang members "are in the alley that is the alleged gang turf of 200 Westwood, that they are present [there.]" Hicks has not addressed that theory of admissibility urged by the prosecutor and adopted by the trial court. Thus, the video was probative of several issues: the existence of the gang, its members, and the credibility of prosecution witnesses.

32

The YouTube video also was not unduly prejudicial. The jury saw several other photographs of Hicks with fellow gang members who were holding guns, which diminished the possibility this video alone would inflame the jury's emotions against him. (See *People v. Nguyen*, *supra,* 61 Cal.4th at p. 1073 [evidence of four guns admitted over defendant's objection not unduly prejudicial, because "[t]here was a significant amount of other evidence linking defendant to firearms"].)

Moreover, the content of the YouTube video itself was not highly inflammatory. While some images in it (particularly of Howland) do tend to glorify the possession of guns, the content of the video is not nearly as disturbing as the evidence involved in the cases Hicks cites. (See *Coneal*, *supra*, 41 Cal.App.5th at pp. 965-972 [abuse of discretion to admit five rap videos with minimal probative value, because lyrics "describe graphic, widespread violence" and are misogynistic]; *Gamory*, *supra*, 635 F.3d at pp. 488, 493 [error to admit rap video with "explicit lyrics dealing with drugs, sex, profanity, degradation of women, firearms, and threats of violence against the police and public" in prosecution for illegal drug dealing; video had minimal probative value and lyrics were "heavily prejudicial" because they "could reasonably be understood as promoting a violent and unlawful lifestyle"]; *Skinner*, *supra,* 218 N.J. at pp. 500, 521 [in attempted murder prosecution, error to admit "violent, profane, and disturbing rap lyrics" written by defendant that were "graphically violent" and "glorifi[ed] . . . violence and death, and defendant's apparent disregard for human suffering"].) Unlike in those cases, the YouTube video was played without sound and so the jury heard no violent lyrics. The video was clearly identified at trial as a music video, it does not depict any acts of violence, and

its overall thrust, at least visually, is as a tribute to a fellow gang member, not a graphic description of violence or lawlessness or a call to violence.

In addition, the brief segments of the YouTube video in which Hicks himself appears—15 seconds of silent video footage in all, and mostly *not* with anyone who appears to be holding a weapon—are fleeting. The video did not create an undue risk the jury would perceive Hicks as a young man prone to criminality or violence. At most, he appears in the video as literally a silent chorus member in segments that are for the most part free of any indication of weapons or criminality, and the overall tenor of the silent video itself—particularly because it was played without sound—is clearly intended as artistic expression. The relatively nonviolent character of its visual imagery distinguishes it from the evidence addressed in cases upon which Hicks relies, all of which turned on the content of disturbingly violent rap lyrics.

Rap music and other forms of artistic expression that refer to guns or violence, although they undoubtedly carry the risk of prejudice, are not always unduly prejudicial. For example, this case is more akin to *United States v. Recio* (4th Cir. 2018) 884 F.3d 230, 236, which upheld the admission of a Facebook post by the defendant quoting a violent rap lyric referring to the possession of a gun, in a prosecution for illegal weapons possession. Distinguishing *Gamory* and other cases involving rap lyrics that described "a panoply of violent, criminal, or distasteful conduct" and "primarily served to paint the defendant in an unflattering light," the court reasoned that no similar content was involved. (*Recio,* at p. 236.) Rather, it explained, "[t]he Government introduced a rap lyric consisting of a single sentence that described only the type of conduct of which [defendant] is accused—carrying a gun—and a reason for doing so—self-protection. Unlike *Gamory*[, *supra,*

34

635 F.3d 480], the lyric referred to no other, irrelevant behavior, like threatening the police or degrading women, that would have unfairly caused the jury to see [defendant] as a culpable person." (*Ibid*.) Thus, it concluded, the risk of unfair prejudice from the Facebook post did not substantially outweigh its probative value. (*Ibid*.)

For these reasons, we conclude that in light of the YouTube video's probative value to corroborate eyewitness testimony, its relatively non-inflammatory content that was presented to the jury in a manner (i.e., silently) that tended to convey its purpose as artistic expression rather than as a literal endorsement of a violent lifestyle, and the fact that there was other evidence of Hicks associating with people who carry guns, Hicks has not demonstrated the court abused its discretion in concluding its potential for prejudice substantially outweighed its probative value. (See Evid. Code, § 352).

He also has not shown it was error to exclude as inadmissible hearsay the disclaimer at the beginning of the video indicating that the guns were props.

Hicks does not assert that the disclaimer is *not* hearsay, and it clearly is. The disclaimer was an out-of-court declaration offered to prove the truth of what it asserted: that the guns were not real. That is hearsay (see *People v. Valencia* (2021) 11 Cal.5th 818, 831; Evid. Code, § 1200, subd. (b)) and Hicks does not argue, and cites no authority, to the contrary.

Rather, his only argument on this point is that the disclaimer is not case-specific hearsay barred by *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). *Sanchez* has no bearing, however. *Sanchez* does not announce a rule requiring the introduction of hearsay. It addresses the kind of information about which an expert witness may testify as the basis for an

expert opinion, distinguishing between general knowledge in the expert's field of expertise (which is permissible under state law, even though based on hearsay information) and case-specific facts about which the expert has no independent knowledge (which is not, unless such facts are proved by independent competent evidence such as a witnesses with personal knowledge of them), and also addressing when such testimony implicates the federal confrontation clause. (See *Sanchez,* at pp. 676-678, 685-686.) Here, Detective Thompson did not base any of his opinions on the disclaimer that the guns depicted in the video are props (nor even on the images of the guns themselves). He did not testify about the disclaimer, and the jury did not learn of it. *Sanchez* is inapposite.

Finally, any error in admitting the video was harmless beyond a reasonable doubt for the same reasons as was any error in admitting evidence of Hicks's possession of the semiautomatic weapon found in his possession at the time of his arrest. (See *Coneal, supra,* 41 Cal.App.5th at pp. 972-973 [reviewing erroneous admission of rap videos for state law harmlessness under *Watson*].) To briefly summarize, there was abundant admissible evidence, which we have already discussed, that Hicks associated with people who carried weapons and, insofar as he is a validated member of the Westwood gang, condoned their conduct; he was depicted in a photograph flashing a gang sign with Nickolas Howland who was holding a gun; and, indeed, there was evidence that in a call from jail Hicks boasted that he would *fire* a gun when he gets out of custody. In addition, the jury did not ask to re-watch the YouTube video (focusing instead on the jail calls), and the prosecutor barely mentioned it in closing argument. Beyond a reasonable doubt, admission of the video did not contribute to the jury's verdict of guilt.

# IV.

## *The Gun Photograph*

Finally, Hicks challenges the admission of a photograph from Instagram in which he is pointing a gun at the camera, again as "another example of the use of cumulative gang evidence as impermissible character evidence creating the image of appellant as a violent gangster."  The photograph, Exhibit 117, was introduced through the People's gang expert, Detective Thompson, who testified that it was the same photograph as the one somebody displayed to Hicks on her phone during his video call from jail with her.  He testified it was taken in one of the alleyways on the 100 block of Westwood Street, and depicts Hicks together with Desean Johnson, Damaria Calvin and Nickolas Howland, who are displaying 200 Westwood gang signs.

Out of the jury's presence, Hicks had previously objected to the photograph's admission under Evidence Code section 352 for an unspecified reason (stating only that his section 352 objection was based on "relevance and a prejudicial value, plus a probative value").  He did not specifically object the photograph was cumulative of other evidence nor object to it because it depicted a firearm.  The trial court overruled the objection, on the ground the prosecutor "is trying to prove-up a gang case, and this photo shows four alleged gang members in obvious gang activities with gang sign in obvious gang territory."

The trial court did not abuse its discretion in later admitting the photograph into evidence.  The photo's probative value was arguably minimal, given other evidence of Hicks's gang affiliation.  But its relevance was not outweighed substantially by the potential for prejudice, for reasons similar to those in *People v. Merriman* (2014) 60 Cal.4th 1 (*Merriman*).

In *Merriman*, another murder prosecution, the Supreme Court held the trial court did not abuse its discretion under Evidence Code section 352 by admitting into evidence several photographs of the defendant holding knives, including one in which he was pointing a knife into the camera. (*Merriman, supra,* 60 Cal.4th at pp. 81-82.) The Supreme Court acknowledged the probative value of the photographs "was arguably limited." (*Id*. at p. 82.) But it held the photographs were "neither unduly inflammatory nor likely to engender an emotional response by the jury," because neither one showed defendant threatening anyone with a knife, and there also was other evidence "that defendant and his fellow gang members routinely wielded knives and other weapons." (*Ibid*.) Thus, the trial court "reasonably could determine that, on balance, the probative value of the photograph evidence was not substantially outweighed by its potential prejudicial effect." (*Ibid*.)

The same is true here. To be sure, in *Merriman* unlike here, some of the extensive additional evidence of weapons possession was graphic. (*Merriman, supra,* 60 Cal.4th at p. 82.) But in this case, in addition to the evidence we have already discussed on the subject of weapons possession—including Hicks's own boasting about guns while in custody—the potentially prejudicial impact of the photograph of him holding a gun was considerably diminished, because the jury saw the very same photograph displayed to Hicks during one of Hicks's video calls from jail, and saw Hicks peering at it. That video clip was played for the jury without objection, and its admission is not challenged on appeal.

Accordingly, there was no error in the admission of Exhibit 117, and none of the authorities Hicks cites are to the contrary.

For the reasons already discussed, any error in its admission also was harmless under either *Watson* or *Chapman*.

# V.

## *The Ballistics Expert's Opinion*

The final evidence challenged by Hicks is certain opinion testimony by the People's ballistics expert, Eugene Banga-An, who, as noted, testified about his forensic examination of the bullets, casings and bullet fragments recovered by police. Hicks asserts the trial court erred prejudicially by permitting Banga-An to testify that one of the recovered bullets could possibly have been from a .9-millimeter firearm, i.e., the type recovered from Hicks in January 2018 when he was arrested.

### A.    Background

During direct examination, the prosecutor asked Banga-An about a bullet core he examined that had been retrieved from the victim's body:

"Q.    Now, that bullet core, what caliber was that bullet core?

"A.    I couldn't tell the exact caliber. It's because it's missing some information that allows me to make my determination.

"Q.    Could that have been a 9mm?

"A.    Possible.

"Q.    Could it have been a .45?

"A.    Possible.

"Q.    Could it have been a .40?

"A.    Yes.

"Q.    And looking at—you tried to examine it; is that true?

"A.    Yes.

"Q.    And based on your examination, you were not able to tell us, based on your professional experience, what caliber that lead bullet core was; correct?

"A.    Yes. It's because it's too deformed and it's missing some parts."

The prosecutor then asked Banga-An about a second bullet core he examined, which elicited an objection by the defense:

"Q.     That lead bullet core, that is a separate lead bullet core than the other lead bullet core that you just talked about, right?

"A.     Yes.

"Q.     Totally different, true?

"A.     Totally different.

"Q.     Did you examine that?

"A.     Yes.  Based on my examination, I wasn't able to determine the caliber of the core—

"Q.     Could it have been—

"A.     —due to damage.

"Q.     —could it have been a 9mm?

"[DEFENSE COUNSEL]:  I'm going to object as to the form of speculation, if he doesn't know.

"THE COURT:  Overruled. [¶] You can re-ask your question.

"Q.     . . . Did you hear the question?

"A.     Yes.  It could be 9.  It could be .40.  It could be .45."

On cross-examination, Banga-An acknowledged that he wasn't able to determine that any of the bullets were anything other than .40-millimeters, the only evidence was that the shots were fired from a .40-millimeter gun, and there was no evidence that a .9-millimeter gun fired any of the bullets he examined.  He also acknowledged that it would be speculation to determine the type of gun from which one of the deformed bullet cores came.  He also was cross-examined about his opinion that three guns might have been used, making clear that his opinion rested not on the fact that some of the ballistics evidence was too deformed to be identified but, rather, on the impossibility of

40

matching up the ten .40-millimeter caliber shell casings from one gun to any particular bullet or bullets, including the two groups of .40-millimeter caliber bullets that he determined were from two different guns. He explained, "I cannot make the comparison between the casing to the bullet, so since I cannot do that, these casings may have been related to this bullet, or not at all."

## B. Analysis

Hicks argues that Banga-An's testimony that one of the unidentifiable bullets could possibly have been .9-millimeter caliber was irrelevant and inadmissible, because it was "sheer speculation" and thus improper expert opinion. Alternatively, he contends that even if relevant, Banga-An's opinion should have been excluded under Evidence Code section 352 as more prejudicial than probative, an objection he did not assert below.

Assuming without deciding the latter objection was preserved, it is unnecessary to address whether any error occurred because, under any standard of prejudice, the claimed error in allowing this testimony was harmless, including beyond a reasonable doubt. The jury indisputably rejected Banga-An's theorizing that a .9-millimeter gun might have been involved, because it concluded that Hicks did not possess or fire a gun during the commission of the offense. We agree with the People that, in these circumstances, Hicks "cannot possibly show he was prejudiced by the ballistics expert's testimony." Hicks contends the inadmissible opinion was prejudicial, because it "improperly corroborated an otherwise extremely weak eyewitness identification case." But testimony that a .9-millimeter gun might have been involved, even if erroneously admitted, in no way affected the jury's conclusion that Hicks participated as an aider and abettor to the shooting and that there was in fact no third gun involved in addition to the

41

two .40-millimeter weapons the ballistics evidence conclusively established. Hicks does not address that problem. Indeed, he appears to concede that any error in allowing Banga-An's opinion was not prejudicial, as his reply brief is silent about this claim of error.

## VI.

### *Cumulative Error*

Hicks argues the combined effect of two evidentiary errors, cumulatively, were prejudicial and require reversal: the erroneous admission of evidence concerning his unlawful possession of a .9-millimeter gun, and the erroneous admission of Banga-An's opinion that a .9-millimeter gun could have been used in the shooting. Although, as just discussed, we have assumed error for purposes of the latter claim, we have concluded the court did not err in allowing evidence of Hicks's gun possession. There is thus "nothing to cumulate" with regard to any error in the admission of Banga-An's opinion and which, as explained, was utterly harmless. (*People v. Duff* (2014) 58 Cal.4th 527, 562; see also *People v. Butler* (2009) 46 Cal.4th 847, 885 [rejecting cumulative error claim where there was "no substantial error in any respect"].)

## VII.

### *Sentencing Issues*

Finally, Hicks raises two claims pertaining to his sentencing.

### A. Ineffective Assistance of Counsel Regarding Youth Offender Parole Eligibility

Hicks was 21 years old when he committed his offenses and received an indeterminate sentence of 15 years to life for the murder count plus a consecutive term of 10 years for the criminal street gang enhancement. Thus, he will be eligible for a youth offender parole hearing no later than his 25th year of incarceration. (See § 3051, subd. (b).) "A youth offender parole

hearing is a hearing by the Board of Parole Hearings for the purpose of reviewing the parole suitability of any prisoner who was 25 years of age or younger . . . at the time of [his or her] controlling offense." (§ 3051, subd. (a)(1).) At the hearing, the parole board "shall give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).)

In *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), a juvenile tried as an adult and sentenced to 50 years to life in prison for first degree murder, challenged his sentence under Eighth Amendment jurisprudence prohibiting the imposition of sentences on juvenile offenders that are the functional equivalent of life without parole. (*Franklin,* at p. 268.) The Supreme Court held the Legislature's enactment of the youth offender parole eligibility scheme after the defendant had been sentenced rendered his constitutional challenge moot, because the new statutory scheme provided him with parole eligibility after 25 years. (*Id.* at pp. 272, 279-280.) However, because it was not clear from the record if the defendant "had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing," the Supreme Court issued a limited remand with directions for the trial court to "determine[e] whether [defendant] was afforded an adequate opportunity to make [such] a record." (*Id.* at pp. 284, 286-287.) The Court specified that if the trial court determined that the defendant did not have a sufficient opportunity, then both he and the prosecution would be allowed to place on the record any information they deemed pertinent to the youth-related factors, in order "to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense" so that the parole board would have

43

that information available at the defendant's eventual parole hearing. (*Id.* at p. 284.)

Here, Hicks contends his counsel was ineffective by failing to make an adequate record at sentencing of information relevant to his eventual youthful offender parole hearing, including evidence of severe cognitive damage as a juvenile that would have been relevant. He contends, therefore, that his case should be remanded pursuant to *Franklin* to enable him to present evidence of youthful mitigating factors.

To establish a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, considering all the circumstances, and that the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)

It is unnecessary to address whether this record is adequate on direct appeal to assess defense counsel's performance as deficient, because there was no prejudice. As Hicks acknowledges, a defendant whose conviction is final is entitled to file a post-judgment motion to preserve evidence of youth-related mitigating evidence pursuant to *Franklin*. (*In re Cook* (2019) 7 Cal.5th 439, 446-447, 451, 458-459; § 1203.01.) And the People concede that Hicks is not foreclosed from utilizing that mechanism to obtain a *Franklin* hearing after his conviction and sentence are final. Thus, Hicks has not and cannot demonstrate that counsel's performance at sentencing in any way impaired his rights with respect to his eventual parole eligibility. Moreover, because he may file such a post-judgment motion the moment this appeal concludes, ordering a remand with directions to conduct a *Franklin* hearing for deficient performance of counsel would be pointless. (Cf. *Cook*, at

44

p. 447 [availability of post-judgment relief to make a record under *Franklin* precludes habeas relief in the first instance]; *People v. Medrano* (2019) 40 Cal.App.5th 961, 968 [declining to order remand pursuant to *Franklin* on direct appeal in light of availability of post-judgment relief pursuant to *Cook*; "given the availability of the motion hearing described in *Cook*, we see no basis to order the same relief that was granted in *Franklin*. Instead, we affirm without prejudice to [appellant's] filing a motion 'for a *Franklin* proceeding under the authority of section 1203.01' and *Cook*"].)

## B.     Unconstitutional Fines and Fees

Finally, the trial court ordered Hicks to pay a $10,000 restitution fine (§ 1202.4, subd. (b)) and a $10,000 parole revocation fine (§ 1202.45). Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Hicks challenges the imposition of these fines as unconstitutional because the prosecution presented no evidence he had the ability to pay them. In addition to addressing the merits of this issue, the People argue it has been forfeited.

Hicks acknowledges he did not raise this issue below. But he asks us to exercise our discretion to consider it, principally because his sentencing occurred prior to *Dueñas* and thus, he argues, an objection at trial would have been futile.[15]

We agree with the People this issue has been forfeited. The trial court imposed the restitution fine at sentencing on March 5, 2020, more than a year after *Dueñas* was decided. (See *Dueñas, supra,* 30 Cal.App.5th 1157.)

---

[15] He also implies that the court's alleged error resulted in an unauthorized sentence, which presents a pure question of law that is reviewable for the first time on appeal. It did not. (See *People v. Avila* (2009) 46 Cal.4th 680, 729 [imposition of restitution fine in amount above statutory minimum not an unauthorized sentence, and claim of inability to pay it held forfeited for lack of an objection].)

Therefore, Hicks was on clear notice of the constitutional dimensions of this issue and it would not have been futile to raise his constitutional objection below.

Moreover, *Dueñas* aside, because the trial court imposed the restitution fine in an amount above the statutory maximum, Hicks had a statutory right, and indeed incentive, to assert an objection in the trial court that he is unable to pay it. "Section 1202.4, subdivision (c), specifies a defendant's inability to pay is not a compelling and extraordinary reason to refuse to impose the fine, but inability to pay 'may be considered only in increasing the amount of the restitution fine in excess of the minimum fine [of $300].' . . . Given that the defendant is in the best position to know whether he has the ability to pay, it is incumbent on him to object to the fine and demonstrate why it should not be imposed." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.) A defendant's failure to do so forfeits any "inability to pay" appellate claim, which rule has even been applied to fines beyond the statutory minimum that were imposed by trial courts before *Dueñas* was decided. (See *Frandsen,* at pp. 1153-1155; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 182; *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1034 [by failing to object and argue he was unable to pay restitution fine that was far beyond the statutory minimum, defendant forfeited argument that court's failure to consider ability to pay violated his constitutional rights and left no doubt he would not have challenged lower court funding assessments even if he had known of right later established in *Dueñas*]; *People v. Smith* (2020) 46 Cal.App.5th 375, 395 [defendant forfeited challenge to assessments and fines because he failed to object in the trial court on the ground that he was unable to pay, even though trial court imposed a $10,000 statutory maximum

restitution fine]; *People v. Taylor* (2019) 43 Cal.App.5th 390, 400-401 [defendant forfeited *Dueñas* challenge to imposition of the maximum $10,000 restitution fine].)

"In setting the amount of the [restitution] fine pursuant to [section 1202.4,] subdivision (b) in excess of the minimum fine pursuant to paragraph (1) of subdivision (b), the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime." (§ 1202.4, subd. (d).)  The parole revocation fine must be set in the same amount as the restitution fine. (§ 1202.45, subd. (a).)

Under section 1202.45, subdivision (b), if Hicks had argued in the trial court that the restitution and parole revocation fines should be reduced because he was unable to pay the $10,000 restitution fine, the court could have considered whether to reduce the amount, which would in turn have reduced the matching parole revocation fine.  He did not assert he was unable to pay, resulting in his forfeiture of his claims about these fines.

In short, we conclude that Hicks forfeited his *Dueñas* challenges to the assessments and the fines by failing to raise them in the trial court.  We therefore do not address the merits of those claims.

## DISPOSITION

The judgment is affirmed, without prejudice to defendant's filing a motion in the trial court for a *Franklin* proceeding pursuant to section 1203.01 and *In re Cook* (2019) 7 Cal.5th 439.

47

_____

STEWART, J.

We concur.


_____

KLINE, P.J.


_____

MILLER, J.

*People v. Hicks* (A159863)